RANDALL CASSEM

*v.*

CAROLINE HEUSTIS.

*Opinion filed February 18, 1903.*

1. MORTGAGES—*a deed intended as security for a debt is a mortgage.* A deed intended as security for a debt is a mortgage although absolute in form, whether the intention is manifested by a written defeasance, a parol declaration or the acts of the parties.

2. SAME—*agreement extinguishing equity of redemption must be fair.* An agreement between a mortgagor and mortgagee, by which the mortgagor's equity of redemption is extinguished and the entire estate is vested in the mortgagee, will not be sustained, in equity, unless the transaction is fair, and free from oppression, fraud or undue influence.

3. SAME—*relation of parties may be considered in determining fairness of agreement.* In determining whether an agreement for the extinguishment of the equity of redemption is fair and just to the mortgagor the relations of the parties will be inquired into.

4. ATTORNEY AND CLIENT—*attorney cannot profit by buying judgment against client.* An attorney who induces a creditor of his client to obtain judgment on his claim, which the attorney then purchases for less than its face value with a view to selling his client's property on execution, must, at least, credit his client with his profit in the transaction when advancing her the amount necessary to redeem from the execution sale.

5. SAME—*when agreement between attorney and client is not enforceable.* An oral agreement to release an attorney from his bond to reconvey property to his client upon payment of the note which her deed to him was intended to secure, and to allow him to keep the property in payment of his bill for legal services, part of which had been rendered in connection with such property, cannot be enforced against the client, particularly where the note had been paid and the bill for services contained many items of over-charge.

6. SAME—*business transactions between attorney and client are closely scrutinized.* Business transactions involving deeds, notes and mortgages, conducted between the parties as debtor and creditor while the relation of attorney and client existed between them, can only be sustained, when attacked by the client, upon proof that they were fair and honest, and any doubts must be resolved in favor of the client.

7. WITNESSES—*when husband may testify in wife's behalf.* Under section 5 of the Evidence act a husband may testify in behalf of his wife where the litigation concerns her separate property.

8. LACHES—*when delay in filing a bill to redeem does not amount to laches.* Filing bill within ten years after a mortgage debt matures, to compel re-conveyance of land held as security under a deed absolute in form is sufficient to avoid the imputation of *laches*, where it appears the complainant tried for years to induce the defendant to re-convey, and for that purpose called frequently at his office but he repeatedly refused to see her and avoided her.

APPEAL from the Circuit Court of Kendall county; the Hon. GEORGE W. BROWN, Judge, presiding.

This is a bill, filed by appellee in the circuit court of Kendall county on September 17, 1894, against the appellant for an accounting in regard to certain business transactions between them, and to compel appellant to execute to appellee a quit-claim deed of her one-fifth interest in a tract of 138.10 acres of land in that county, subject to the life estate therein of appellee's mother, Sarah Ann Boyd, and also to compel appellant to execute to her a quit-claim deed of a certain other tract of land containing 4.64 acres. The bill alleges that appellee, on February 5, 1885, being then the owner of said interest in said tract of 138.10 acres of land subject to said life estate, executed a quit-claim deed, conveying the same to appellant for the purpose of securing the payment of a note executed by appellee to appellant; and that, upon the same day, appellant and appellee executed a bond in writing, by the terms of which appellant agreed to convey back to appellee her interest in said tract of land upon the payment by her of said note when the same should be due by the terms thereof. The appellee alleged in her bill, in substance, that she had performed the conditions named in the bond, and was, therefore, entitled to a quit-claim deed of her share in the premises mentioned.

Appellant, on October 24, 1894, filed an answer denying the allegations of the bill, and that appellee was entitled to the relief prayed for. In his said answer appellant claimed to be the absolute owner of the premises

201—14

in question. Replication was filed to the answer, and appellant then filed a cross-bill, setting up substantially that, by an arrangement between himself and appellee, the quit-claim deed, executed to him by her on February 5, 1885, was to be held by him, and that he was thereafter to remain the owner of said premises in satisfaction of the indebtedness existing from appellee to him. The cross-bill thereupon prays, that the written contract or bond for a deed, executed by him on the same day, should be taken up and canceled and destroyed. The prayer of the cross-bill was that, on a final hearing, appellee might be decreed to deliver up and have canceled said bond for a deed. An answer was filed on December 19, 1894, by appellee to the cross-bill, denying its allegations. On March 14, 1895, appellee filed an amendment to her answer to the cross-bill, setting up the Statute of Frauds, as a defense to that portion of the cross-bill, which alleged that, by an oral agreement, appellant was to keep the land deeded to him as a payment and satisfaction of the indebtedness due to him.

On February 24, 1896, the appellee filed an amendment to the original bill, setting up the recovery against her of a judgment by one Franklin M. Hobbs, and the issuance of execution thereon, and the levy of said execution upon her interest in said 138.10 acres, and a sale of the same under said execution by the sheriff to one William H. Hopkins, and the issuance of a certificate of purchase to Hopkins. The amendment also sets up the connection of the appellant with the recovery of said judgment, and the sale thereunder, and charges that therein she was defrauded by the appellant, and had no knowledge of his fraudulent connection with said Hobbs' judgment until after she had executed said deed of February 5, 1885. By said amendment appellee also set up the facts in regard to an alleged accounting, which took place between herself and appellant on December 26 and 27, 1887, and, in connection therewith, alleged that she

had paid in full all her indebtedness to the appellant. On November 6, 1895, and again on February 24, 1896, appellant filed answers to the amendment denying the allegations thereof. On April 10, 1899, appellant filed a further amendment to his answer, charging that appellee had been guilty of *laches* in not sooner beginning her suit. On April 3, 1899, appellant filed an amendment to his original answer, setting up, among other things, that one Lester Kennedy in June, 1885, had recovered a judgment before a justice of the peace against appellee, and that, upon an appeal from said judgment to the circuit court, appellant had signed an appeal bond for appellee; and that, on January 26, 1885, appellee agreed that she would not require appellant to convey back to her the property mentioned in said bond for a deed, dated February 5, 1885, until he had been fully indemnified on account of his liability upon said bond, and that he should hold the property as security until he was relieved of said liability. In the amendment to his original answer, so filed on April 3, 1899, the appellant avers that he has never been released from his obligation on said appeal bond, and that the conveyance, so made to him of said property, is the only security he holds for the purpose of such indemnity; and, thereupon, appellant asserts in said amendment that the appellee had no right to file or maintain her bill because of said existing liability upon said appeal bond. In other words, the claim is made by appellant in his said amendment, that the suit of appellee had been prematurely brought by reason of the continued existence of such liability upon the appeal bond.

Testimony was taken; and, on April 7, 1902, the circuit court of Kendall county rendered a final decree, granting the prayer of the bill, so far as the tract of 138.10 acres was concerned, but refused relief to appellee, so far as the tract of 4.64 acres was concerned. The decree found that on February 5, 1885, the appellee, Caroline Heustis, was the owner of a one-fifth share in expect-

ancy or remainder in said tract of 138.10 acres; that, on
February 5, 1885, she executed to appellant a quit-claim
deed of said premises to secure $130.00, and appellant
executed and delivered to her a writing obligatory for
the re-conveyance of said premises to her upon the pay-
ment by her to him of said sum of $130.00 within one year
from the date thereof, with interest at eight per cent per
annum, as evidenced by a promissory note of that date,
signed by appellee and her husband, James C. Heustis,
for the sum of $130.00; that, on or about February 25,
1885, the note of $130.00 was given up by appellant to
appellee, and a new note for $253.00 was executed by
appellee and her husband to the appellant, dated Feb-
ruary 5, 1885, and at the same time the bond for a deed
was changed with the consent of appellee from $130.00 to
$253.00, so as to read that appellant would re-convey the
premises to appellee upon the payment by her to him of
$253.00 within one year from February 5, 1885, with inter-
est at eight per cent per annum; that said deed, though
absolute on its face, was in fact a mortgage to secure the
note for $253.00, and that appellee had an equity of re-
demption; that, on January 26, 1886, there was executed
between appellee and appellant a writing, providing that
appellee should save and keep harmless appellant from
signing an appeal bond for $200.00 in the case of Lester
Kennedy *vs.* Caroline A. Heustis, and therein appellee
agreed that she would not require appellant to convey
the property, described in the bond for a deed of Febru-
ary 5, 1885, until he had been fully indemnified from said
bond, and that he should hold said property as his secur-
ity; that, before the filing of the original bill in this case,
appellee had fully paid to appellant the amount of the
note for $253.00, for which the quit-claim deed was given
as security, and that said note was then by appellant de-
livered up to appellee as fully paid and satisfied; that,
at the time of the filing of the bill herein, appellee had
not paid the Lester Kennedy judgment, and at that time

had not saved the appellant harmless for signing said appeal bond, but that, since the filing of the bill herein, and on October 12, 1898, appellee fully paid and satisfied the Lester Kennedy judgment, and thus saved appellant harmless for the signing of said bond; that appellee has fully paid and satisfied appellant for all that said quit-claim deed was given to him by her to secure, and that appellee is entitled to redeem said tract of 138.10 acres from the mortgage and the lien thereof, and that appellee is entitled to a re-conveyance from appellant of the 138.10 acres in question; and it was thereupon ordered and decreed, that appellant, within ten days from the entry of the decree, should execute and deliver a deed, conveying to appellee all his right, title and interest in said 138.10 acres, and, on his failure to do so, that the master should execute such deed. The decree further found that appellee was not entitled to a conveyance of the tract, containing 4.64 acres, and the legal title of said last described tract was declared to be in the appellant in fee simple; and it was ordered and decreed that the appellee pay the legal costs of the suit.

From the decree so entered by the circuit court the present appeal is prosecuted.

ALBERT J. HOPKINS, FRED A. DOLPH, ROBERT BRUCE SCOTT, and DAVID J. PEFFERS, for appellant.

GEORGE M. HOLLENBACK, and CHARLES WHEATON, for appellee.

Mr. CHIEF JUSTICE MAGRUDER delivered the opinion of the court:

The appellant is an attorney at law, and, during the transactions here involved, the relation of attorney and client, as well as the relation of creditor and debtor, existed between him and appellee. Appellee began to consult him as a lawyer in her business affairs as early

as 1882, and the relations thus indicated existed between them from that time until the last of December, 1887. While the relation of attorney and client existed between appellant and appellee, and while the relation of creditor and debtor existed between them, they met, on February 5, 1885, and, as we understand the evidence, the meeting took place at appellant's office in Yorkville, Kendall county. There, on February 5, 1885, appellee and her husband, James C. Heustis, executed a note dated Yorkville, February 5, 1885, for $130.00, by which, one year after date, they jointly and severally promised to pay to the order of appellant $130.00 with interest at eight per cent per annum. At the same time, for the purpose of securing this note of $130.00, appellee and her husband executed to the appellant a quit-claim deed, conveying to him all of appellee's one-fifth interest, subject to her mother's life estate, in the tract of 138.10 acres, mentioned in the statement preceding this opinion. The property was the separate property of appellee, inherited by her from her father. The deed was recorded the next day, to-wit, on February 6, 1885, in the office of the recorder of deeds of Kendall county. At the same time, to-wit, on February 5, 1885, appellant executed to appellee the bond for a deed mentioned in the statement preceding this opinion. The bond was in the penal sum of $130.00, and its condition recited that, whereas Caroline Heustis had given to Randall Cassem a note for $130.00 with interest at eight per cent, payable to his order, and signed by her and James C. Heustis, if, on payment of the note and interest being made at the time when they should become due, Cassem or his representatives, should, whenever thereunto afterwards requested, execute and deliver to Caroline Heustis, or her legal representatives, a good quit-claim deed conveying to her his interest in the real estate of William P. Boyd, deceased, devised by him, and occupied by his widow, Sarah Ann Boyd, containing 138 acres, more or less, and more fully

described by the quit-claim deed, dated February 5, 1885, given to said Cassem, and on re-conveyance the description therein to be used free and clear of all encumbrance, then the obligation to be null and void, otherwise to be in full force and effect, "it being distinctly understood and agreed by and between the parties hereto that the payment herein above fixed shall be material and of the essence of this contract, and that, in case of failure therein, the intervention of equity is forever barred."

There can be no doubt that this deed, though absolute on its face, was a mortgage, when considered in connection with the written defeasance or bond, executed simultaneously with the deed. Nor was it any the less a mortgage, because of the insertion, in the bond of the above quoted clause, making time of the essence of the contract, and barring the intervention of equity. (*Tennery* v. *Nicholson*, 87 Ill. 464; *Jackson* v. *Lynch*, 129 id. 72.) The doctrine is well settled that a deed, absolute in terms, if intended to secure an indebtedness, is a mortgage whether the intention is manifested by a written defeasance, by parol declarations, or by the acts of the parties. (*Price* v. *Karnes*, 59 Ill. 276; *Carr* v. *Rising*, 62 id. 14; *Smith* v. *Doyle*, 46 id. 451; *Hunter* v. *Hatch*, 45 id. 178; *Sutphen* v. *Cushman*, 35 id. 186). Where a debtor conveyed real estate to his creditor by deed absolute in form, and also gave his note for the amount due, and the grantee at the same time gave the grantor a contract for a re-conveyance of the premises upon payment of the note and interest, it was held that the deed, note and contract to re-convey all constituted but one transaction, which was a mortgage. (*Jackson* v. *Lynch*, 129 Ill. 72).

On February 24 or 25, 1885, it is claimed by the appellant that a further indebtedness of $123.00 was incurred by appellee to him. Thereupon, the old note of $130.00 was canceled and surrendered by appellant to appellee, and a new note for $253.00, made up of the $130.00, represented by the old note, and the $123.00 above mentioned,

was executed by appellee and her husband, dated February 5, 1885, by the terms of which the makers thereof jointly and severally promised one year after date to pay to the order of Randall Cassem $253.00 with interest at eight per cent per annum. The bond for a deed was then changed by inserting the sum of $253.00 in place of the sum of $130.00, so that it stood as a bond for the re-conveyance of the property upon the payment of the note for $253.00, instead, as theretofore, of the note for $130.00.

The only indebtedness, secured by the deed and the defeasance executed simultaneously with it, was said note of $253.00. The evidence is clear and conclusive that both appellant and appellee treated the conveyance and the bond for a deed as a security up to December 27, 1887. Although the note was due in one year, to-wit, on February 5, 1886, it was extended by agreement of the parties, either express or implied, from time to time, until the settlement hereafter referred to was had on December 26 and 27, 1887. There is an endorsement upon the back of the note, showing that on February 19, 1887, more than a year after the maturity of the note, the appellee paid, and appellant accepted, $20.24 for interest.

Both parties claim and admit that the note for $253.00 has been paid, and that such payment was made on December 26 or December 27, 1887. The appellee contends that she paid the full amount due upon the note in money to the appellant on December 26 or 27, 1887, at his office in Aurora. Appellant, on the other hand, claims that, at that time, appellee owed him, according to one statement of the account, $541.23, and according to another statement of the account made by him, $793.72; and that he was paid by an oral agreement on the part of the appellee, consenting to allow him to retain the title to the property, deeded to him on February 5, 1885, as a full payment and satisfaction of the amount claimed to be due from her to him. He says that the bond for a deed, dated February 5, 1885, was executed in duplicate, and

that he had one copy and appellee had one copy of the bond; and that, on December 26 or 27, 1887, he destroyed his bond for a deed in her presence in pursuance of the oral agreement, but that she, not having with her the duplicate copy of the bond, agreed that she would look it up, and bring it in to be destroyed. If the bond was executed in duplicate, the copy held by her was never destroyed, and was produced upon the hearing in this case and is in the record. It will thus be seen that the appellant and appellee contradict each other in regard to the manner, in which the indebtedness, secured by the deed and the bond, was paid and satisfied.

This court has held, it is true, that, where an absolute deed of land is given as security for an indebtedness, a *bona fide* agreement may be made between the mortgagee and the mortgagor, by the terms of which the equity of redemption of the mortgagor may be extinguished, and the entire estate vested in the mortgagee, but such an agreement for the extinguishment of the equity of redemption will never be sustained, unless the transaction is fair, and unaccompanied by any oppression, or fraud, or undue influence. A court of equity will never allow the mortgagee to avail himself of his position to obtain an advantage over the mortgagor by securing such an agreement for the vesting of the entire estate in himself. Contracts between the mortgagor and mortgagee for the purchase or extinguishment of the equity of redemption are always regarded with jealousy by courts of equity. (*West* v. *Reed*, 55 Ill. 242; *Seymour* v. *Mackay*, 126 id. 341; *Scanlan* v. *Scanlan*, 134 id. 630). In order to determine whether such a contract for the extinguishment of the equity of redemption, if it exists, is or is not fair and just to the mortgagor, the relations between the parties will be inquired into. (*Sutphen* v. *Cushman*, 35 Ill. 186; *Conant* v. *Riseborough*, 139 id. 390; *Burton* v. *Perry*, 146 id. 71).

It becomes material, therefore, to inquire into the relations, which existed between appellant and appellee

prior to December 27, 1887, and which existed at that time. The appellee, during the period from 1882 to 1887 owned, first, a share of one-fifth in 138.10 acres of land, subject to her mother's life estate, inherited from her father; second, a tract of 62.64 acres of land in Kendall county, which was her homestead; third, two small tracts of land, one of 4 acres and the other of 4.64 acres, situated in the same county, one tract on one side of the Fox river, and the other tract on the other side of the river; she also owned a considerable amount of personal property, consisting, mainly, as we understand the record, of live stock upon her farm of 62.64 acres.

In 1882 appellee owed a certain amount of taxes, due and payable upon her homestead farm of 62.64 acres, and consulted appellant with reference to the payment of the same. He advised that the land be sold, and that a tax deed be obtained. Accordingly, on June 12, 1882, the land was sold, and, it not having been redeemed from the sale, a tax deed was issued on June 16, 1884, conveying the 62.64 acres, not to appellee, but to appellant. Subsequently, on October 29, 1887, at the suggestion and upon the advice of appellant, appellee and her husband, James C. Heustis, executed another deed, conveying the 62.64 acres to the appellant, in which they released and waived their homestead rights, so that appellant not only had a tax deed upon the homestead farm, but he had the title thereto of the appellee, the owner. On December 29, 1884, appellant induced appellee and her husband to execute to him a deed, conveying to him two small tracts, consisting the one of 4.64 acres, and the other of 4 acres, known in the record as the timber lots. The latter deed was recorded in the recorder's office of Kendall county on December 30, 1894. Prior to this, and on September 21, 1883, the husband of appellee executed to appellant a chattel mortgage to secure a note of $118.00. This chattel mortgage was taken up on October 18, 1883, and, upon the latter day, appellee executed a promissory note,

dated October 18, 1883, to the order of the appellant for
$275.00 payable on or before October 17, 1885, with inter-
est at eight per cent. Before the note for $275.00 became
due, to-wit, on February 5, 1885, the same day on which
the note for $253.00 was executed, appellant induced ap-
pellee and her husband to take up and surrender the note
for $275, and execute to him a new note, dated February
5, 1885, for $289.33, by the terms of which appellee and
her husband jointly and severally promised to pay $289.33
to the order of Randall Cassem two years after date, with
interest at eight per cent payable annually.   On April
24, 1885, appellee executed to appellant a bill of sale, con-
veying to him some hogs upon the "Heustis place" for an
expressed consideration of $26.17.   Although this was
upon its face a bill of sale, there is evidence tending to
show that it was given to secure a note for $25.00, dated
April 24, 1885, executed by appellee and her husband,
by which they promised to pay jointly and severally to
the order of appellant $25.00 seven months after date.
Through the execution of the deeds, chattel mortgages,
and bill of sale above mentioned, appellant obtained the
title to all the property, real and personal, owned by
the appellee while he was acting as her attorney. If she
had any property, either real or personal, which did not
pass into his hands during the period above named, the
record fails to disclose it. During all of this time he was
acting as her attorney and legal adviser, and charging
her fees for his services.   There is in the record an ac-
count drawn up by him against appellee, containing about
forty-two items, more or less, and more than half of the
items in this account upon the debit side thereof are
charges for legal services in certain specified suits and
other matters, claimed to have been rendered to appellee.

In view of the relations between the parties, and the
absorption by the appellant of the property of the appel-
lee, it becomes material to inquire, more particularly and
in detail, into the consideration of the note for $253.00,

to secure which the deed of February 5, 1885, was exe-
cuted. On November 1, 1884, appellee and her husband
were indebted to one Franklin M. Hobbs, a merchant in
Yorkville, in the sum of $100.00. Appellant, the con-
fidential adviser and attorney of appellee, approached
Hobbs with a view of purchasing his claim, or a judg-
ment to be obtained upon his claim against Mrs. Heustis.
He proposed to Hobbs that, if the latter would put his
claim in judgment, appellant would pay him therefor
$25.00 less than the face of the judgment. Appellant
stated to Hobbs that he could not bring the suit himself,
because he was the attorney of Mrs. Heustis, but he pro-
cured an attorney by the name of Fitzgerald to bring the
suit. Accordingly, suit was brought before a justice of
the peace in the name of Hobbs against appellee and her
husband; the summons therein was issued on November
8, 1884, returnable November 15, 1884, at seven o'clock
in the morning. On the morning of November 15, 1884,
judgment was rendered by default against appellee and
her husband for the sum of $101.30, and costs of suit.
Hobbs testifies that on that day, as soon as the judgment
was entered, appellant paid him $71.30 for the judgment,
and that thereafter he, Hobbs, ceased to have any in-
terest in it. Execution was issued on December 8, 1884,
and returned by the constable "no property found." On
December 12, 1884, a transcript was procured from the
justice, before whom the judgment was rendered, and
filed in the clerk's office of the circuit court at Yorkville.
Thereupon an execution was issued, and levied upon the
real estate here in controversy, that is to say, upon the
interest of appellee in the 138.10 acres of land. A sale of
the same was made on the execution, and it was bought
in by one Hopkins, to whom a certificate of purchase was
issued in the interest and for the benefit of the appel-
lant. When appellant was first examined as a witness
in the case, he swore, in substance, that he had nothing
to do with the judgment. But the proof is clear and con-

clusive that he filed the transcript in the circuit court, and it also was conclusively proven that he purchased the judgment of $101.30 from Hobbs, the owner of it, for $71.30. He did not reveal to his client his own connection with the matter, but the proceeding was instigated by him, and the conclusion is irresistible that it was done for the purpose of securing an interest in the premises in question. The trial before the justice was at such an early hour that appellee and her husband were not present, and default was obtained against them. Upon learning of this judgment, and of the sale of her property in the manner above stated, appellee went to appellant to consult him as her legal adviser. It was necessary for her to redeem the property from the sale thus made of it under the judgment in favor of Hobbs. The sum of $130.00 was necessary to make this redemption, and appellant proposed to her to advance the money to effect the redemption from a sale in his interest under a judgment owned by himself, if she would execute to him a note, and give him a deed of the premises in question to secure it. She thereupon executed the note for $130.00, already mentioned, and made the deed, dated February 5, 1885, to appellant to secure the same, the appellant at the same time holding a certificate of sale against her property, upon which he could finally obtain a sheriff's deed if she did not herself make the deed demanded of her. The amount of this note of $130.00 went into and made a part of the note of $253.00 already specified. Appellant obtained the judgment for $30.00 less than its face value, but, in fixing the amount of the note which his client executed to him, he made her pay the full amount, necessary to redeem, without stating to her anything about the discount, at which the judgment had been sold to him by Hobbs. Not only was this transaction a fraud upon his client, the appellee, but his testimony in relation to the matter, contradicted as it is by Hobbs and by the justice, before whom the judgment was rendered,

cannot be regarded as otherwise than false. The balance of the note for $253.00, besides the $130.00 already mentioned, to-wit: the sum of $123.00, is stated by the appellant to have been made up of money advanced to her and of the price of a lumber wagon and a plow sold by him to her.

When appellant and appellee met on the 26th day of December, 1887, in appellant's office at Aurora for the purpose of having a settlement of their accounts, appellant really and in fact owed appellee enough on account of overcharges, such as that already mentioned in relation to the judgment in favor of Hobbs, to offset and overbalance all that was due him for principal and interest upon said note for $253.00. At that time, to-wit, on December 26, 1887, an account, running to December 17, 1887, which had been prepared by appellant, was produced, and was the subject matter of a conference between himself and appellee. In this account the total items of indebtedness, charged against appellee, amount to the sum total of $1027.23. These charges against appellee include the amount of principal and interest, alleged to be due upon the two notes, one for $253.00, and the other for $289.33, and various items of charges for services as attorney, and for disbursements in lawsuits, and for fees paid to other attorneys, and for taxes advanced, etc. The total amount of credits, given to appellee by the terms of this account, amount to $590.00; and the balance, stated on the face of the account to be due from appellee to appellant, is $437.23. One of the items, charged against appellee in the account, is $290.95, being the amount of the principal and interest alleged to be due from February 5, 1885, until December 17, 1887, upon the bond for a deed for $253.00. In the item the sum of $290.95 is alleged to be due, not upon the note of $253.00, but upon the bond for a deed. In view of the fact, that the judgment of Hobbs against appellee was procured by appellant, who was then her attorney, and

was purchased by himself with a view of securing the right to sell her land on execution to pay the judgment, it is a serious question whether he should be allowed to charge against her any part of the $130.00 already mentioned; but, as to $30.00 of such amount, the charge against her, with the interest thereon, was improper. Having obtained the judgment at a sum less than its face by $30.00, he was bound, in justice and equity, to give her credit for that $30.00. He has not done so, however, in the accounting, so that the charge against her of this $30.00, with interest thereon, is wrong. Again, he charges her with $25.00 attorney's fees, paid to A. C. Little for the trial of the replevin suit of Cassem *vs.* George E. Ackerman. Mr. Little, being placed upon the stand as a witness, swears that Mr. Cassem never paid him a dollar of the $25.00 so mentioned in the account; so that the charge against appellee of $25.00 for money, paid out on account of attorney's fees due to Mr. Little, is an improper charge. Again, under the chattel mortgage, dated February 5, 1885, to secure the note for $289.33, a sale was had of the personal property, embraced in the chattel mortgage, on or about November 1, 1886, and $284.00 was realized at such sale. On the debit side of his account appellant charges the appellee with $355.80, being the amount of principal and interest due from February 5, 1885, on the $289.33 up to December 17, 1887, while the evidence shows that, in the fall of 1886, more than a year before, nearly the whole amount secured by the chattel mortgage, to-wit, the sum of $284.00, had been paid. It is true that he credits her on the credit side of the account with the $284.00; but he charges her upon the debit side with interest upon the whole amount of the mortgage without deducting the $284.00, and charges himself with no interest upon the $284.00. In that item, therefore, he charged her $71.80, to which he was not entitled, and it would seem that she was forced to consent to the account by reason of the power, which

he had over her, as the holder of the title to all her property, and as the possessor of the money, raised by mortgage upon her homestead farm in the manner hereinafter stated. In addition to the items already mentioned, appellant obtained from appellee a deed, conveying to him, as already stated, in December, 1884, the two small tracts, one containing 4 acres and the other 4.64 acres, making altogether 8.64 acres for the expressed consideration of $200.00. According to her testimony, the only consideration for this conveyance was the sum total of certain items, amounting to $45.88; according to his testimony, the consideration was $200.00, but just how he paid her $200.00, if he did so, does not appear from the record. It is true that appellee executed a receipt to the appellant, dated December 29, 1884, for $200.00, recited to be in settlement to that date in full against him of all accounts, and he also himself signed a receipt to her for the sum of $200.00 containing the following recital: "By virtue of land deal being in full of legal services to date, and also in full of the following items," (and then follow certain items making a total of $45.88). She was made to sign a large number of papers by the appellant, and swears that she does not remember signing this receipt for $200.00, and claims that he did not pay her $200.00 for the 8 acres in question. If, however, he did so, the proof is quite clear that the 8.64 acres was worth from $40.00 to $50.00 an acre, $140.00 more than the consideration named in the deed. In addition to this, a tenant of appellee's homestead farm by the name of Johnston had given a note for rent amounting to $156.00. Suit was brought by appellant against Johnston upon this note in the name of one Redding, and judgment was obtained before a justice of the peace for $158.16; but it is clear from the testimony that Redding had no interest whatever in the claim or the judgment, and why his name was used does not clearly appear. This judgment was not collected of Johnston, but it appears from documents,

introduced in evidence by the appellant himself, that he, himself, was indebted to Johnston in the sum of about $800.00, so that, if he had been diligent in the prosecution of his client's interest, he could have used a portion of his own indebtedness to Johnston for the purpose of paying the Redding judgment. Other items of overcharges could be readily pointed out, which, taken together, would show most conclusively that, on December 26, 1887, appellee really owed appellant nothing on the note for $253.00. It is questionable whether under the authorities, and for the reasons hereafter stated, appellant had any right to get a deed from the appellee of the 8.64 acres of land in payment of his legal services, while he was acting as her attorney with reference to that land, as well as with reference to the rest of her property. But the court below refused to disturb this conveyance, and appellee has assigned no cross-error upon the record, and, therefore, we leave the decree, so far as that matter is concerned, undisturbed.

But, independently of all that has been said thus far, we are satisfied from the evidence that appellee paid appellant in money all that was due to him upon this note for $253.00 on the 27th day of December, 1887, and was thereafter, under the terms of the bond for a deed, entitled to have a re-conveyance from him of her interest in the 138.10 acres here in controversy.

It has already been stated that, by means of a tax deed to himself dated June 16, 1884, and by means of another deed, dated October 29, 1887, executed to him by appellee and her husband, he held the title to appellee's homestead farm, containing 62.64 acres. He resolved to raise by mortgage upon this farm the sum of $800.00, and it is clear from the evidence that the object of raising this money was to pay himself what he claimed to be due to him from appellee on account of alleged legal services, and other services. Accordingly, he obtained a draft for $800.00. This draft bears date Morris, Illinois, Decem-

201—15

ber 14, 1887, and is for the sum of $800.00 and payable to the order of Thomas Fletcher, and appears to be drawn by the Grundy County National Bank upon the First National Bank of Chicago. On the back of it is the following endorsement: "Pay Randall Cassem, or order.— Thomas Fletcher." Having in his possession this draft for $800.00, appellant wrote several letters to appellee to come to his office in Aurora. Their meeting there on December 26, 1887, was in pursuance of the notices thus given by letter. Besides appellant and appellee, there were present at that time in appellant's office, James C. Heustis, appellee's husband, and one James D. Riddell. Appellant executed a deed from himself to James D. Riddell, conveying the homestead farm of 62.64 acres to Riddell for the nominal consideration of one dollar. A mortgage was then executed by Riddell to Fletcher to secure the $800.00. Why appellant put the title in the name of Riddell, and procured the latter to execute the mortgage, instead of executing the mortgage himself, or instead of conveying the property to appellee and letting her execute the mortgage, is not apparent, but the fact, that the whole matter was arranged for his own benefit, is quite apparent. Probably the reason for this singular transaction was his own unwillingness to become liable by himself signing any notes, or mortgage to secure the loan of $800.00. In connection with the making of the deed to Riddell, and the execution of the mortgage by Riddell, he presented to appellee the account heretofore mentioned, showing a balance due to himself of $437.23. At the bottom of this account appears the following: "All the foregoing items of account agreed to by the parties hereto and settled December 26, 1887.—Randall Cassem, Caroline Heustis." After the deed to Riddell was made, and the mortgage was executed by Riddell, and after the balance of $437.23 was agreed upon as the amount due from appellee to appellant, and after the written endorsement of the account,

made by the appellee in writing, appellant went out to get the draft for $800.00 cashed, the draft having been during the transaction named in his possession; but the bank was closed, and the draft could not be cashed that day. Riddell claimed that there was due to him the sum of $100.00, and insisted that that amount should be paid to him that day. Appellant advanced the sum of $100.00 to Riddell, and Riddell and appellee and her husband left the office late in the afternoon of December 26, 1887. Besides the $100.00 paid to Riddell, appellant charged appellee $1.80 as interest for the time, during which he held the Fletcher draft, to-wit, twelve days, and one dollar for recording the mortgage to Fletcher, and one dollar for drawing the Fletcher note and mortgage, these four items making $103.80. The sum of $103.80 was added to the $437.23, making $541.03. This sum of $541.03 was deducted from the $800.00, leaving $258.97.

Appellee swears that appellant paid her, out of the $800.00, $258.97, and retained the sum of $541.03, and that thereupon the account between them was closed, and her note for $253.00 was paid, and that she was entitled to a deed of her interest in the 138.10 acres. Appellant, on the other hand, swears that he made out another account, showing that appellee was indebted to him in the sum of $793.72, instead of $541.03, and that finding the indebtedness to be so large she then consented that, if he would let her keep the $800.00, he might keep her interest in the 138.10 acres of land, for which he held a deed. In other words, his contention is that she took all of the money, raised by the mortgage, and consented to let him keep the land in payment of what was due to him. The court below found that the appellee had paid her note, and held that she was entitled to a deed. We are inclined to the opinion that the holding of the court below was correct.

The very object of raising the $800.00, by mortgaging the homestead farm in the way already specified, was to

get money to pay appellant what he claimed to be due to himself. This is shown by appellee's testimony, and by the testimony of Redding, and by all the circumstances of the case. Her testimony upon the subject is confirmed by that of her husband, James C. Heustis, and by that of James D. Riddell, who certainly was more disposed to act in the interest of appellant than of appellee. Appellee's statement, that appellant retained $541.03 out of the $800.00 to pay himself, and paid to her only $258.97 is supported and confirmed by all the written memoranda, which appear in the record. For instance, by the terms of the bond for a deed executed on February 5, 1885, appellant was to re-convey the land here in controversy to appellee upon being paid the note for $253.00 and interest thereon according to its terms. Appellee produces upon this hearing the note for $253.00 with the signatures of herself and her husband torn off. In other words, the maker of the note produces the note from the possession of the maker. It is a general rule, that a promissory note, found in the possession of the maker thereof, will be presumed to have been paid by him. (*Sutphen* v. *Cushman*, 35 Ill. 186; *Walker* v. *Douglas*, 70 id. 445; *Harding* v. *Hawkins*, 141 id. 572; *Grimes* v. *Hilliary*, 150 id. 141).

Again, a paper in the handwriting of the appellant with certain figures upon it, made by him, is produced in evidence from the possession of the appellee. The figures upon this paper in the handwriting of the appellant show the deduction of $590.00, the amount of the credits, from $1027.23, the amount of the charges in the account of December 26, 1887, leaving a balance of $437.23; then, under the figures 437.23 are the items, $100.00, $1.00, $1.80 and $1.00, as above mentioned, with a total of "541.23" (which should have been $541.03); then appear the figures 800; under them the figures 541.23, (541.03) and beneath a line drawn under the figures 541.23 appear the figures 258.77, ($258.97) the result reached by deducting 541.23 (541.03) from 800. These figures in appellant's handwrit-

ing, produced from the possession of the appellee, confirm her statement that the settlement of December 26, 1887, was made as she claims it to have been made. She went back to the office on December 27, 1887, and the appellant then obtained the cash upon the draft, and paid her the $258.77. He claims that he made out a new account, showing items of indebtedness from her to him, amounting to $793.72. This account, and the items which make it up, appear in his testimony; but there is evidence, tending to show that she refused to accept as correct the items in this account, which are additional to the items making up the $541.03, or $437.23. She consented to endorse in writing over her own signature the correctness of the account, showing a balance of $437.23, but no such endorsement of correctness on her part appears upon the account, showing the items of the sum of $793.72. Not only does the appellee produce from her possession the canceled note for $253.00, and the memorandum of figures made by appellant, which corresponds with her statement as to what was done, but she produces from her possession the written bond or agreement for a deed dated February 5, 1885. Appellant says that this bond for a deed was executed in duplicate, and that he destroyed his copy on December 26, 1887, and that she promised to bring in her copy, and have it canceled at some subsequent date. She denies this, and all the circumstances confirm the truthfulness of her statement. In view of the manner, in which he dealt with his client, requiring her to sign a writing on every occasion when they had a business transaction, as evidence of what was done between them, it is singular, and not at all credible, that he would not have put into writing in some shape or other the agreement which, he says, was made orally for the destruction of the bonds for a deed, and for the right on his part to retain the land in payment of his debt. In addition to this, the position taken by the appellant in this case in regard to the Lester Ken-

nedy judgment, and the appeal bond executed by him in connection with that matter, is a contradiction of his contention that he was to hold the land in payment, and that she was to take the money. Even if there was such an agreement, it was evidently extorted from the appellee. The $800.00, raised by mortgage, was raised upon her property. The money was hers, and, if she made an oral agreement to let him keep the land in payment of what was due him, she was forced to do so in order to have the privilege of keeping her own money, raised by mortgage upon her own property. She executed on December 26, 1887, an agreement in writing to pay $800.00 to James D. Riddell in the following amounts: $125.00 on or before December 26, 1888; $125.00 on or before December 26, 1889; $175.00 on or before December 26, 1890; $175.00 on or before December 26, 1891, and $225.00 on or before December 26, 1892, with interest on the same to be paid to Thomas Fletcher for $800.00, "said Riddell to retain the rents, issues and profits out of lot A in section 22   *   *   *   sufficient to liquidate above payments with interest and taxes."

As has already been stated, appellant, on January 26, 1886, executed an appeal bond, when the judgment for $69.24 obtained by Lester Kennedy against appellee before a justice of the peace was appealed to the circuit court; and on the same day, to-wit, January 26, 1886, appellee was induced to execute to appellant an agreement to save and keep him harmless for signing said appeal bond in the sum of $200.00, and therein she "further agrees she will not require the said Randall Cassem to convey the property mentioned in one certain bond for deed, dated February 5, 1885, until he has been fully indemnified from said bond, and that he shall hold said property as his security." As late as April 3, 1899, appellant sets up this agreement in regard to the appeal bond in an amendment to his answer, and claims that he is not bound to execute a deed of the property to the

appellee because his liability on the appeal bond still remains, and the judgment is still unpaid. This statement in his answer was untrue, as matter of fact, because the proof shows that on October 12, 1898, appellee paid the Kennedy judgment. If an oral agreement was made on December 26, or December 27, 1887, between appellant and appellee, by which he became the absolute owner of her interest in the 138.10 acres, how can it be true that, on April 3, 1899, he still held the deed, and the bond for a deed, as security against his liability upon the appeal bond in the Kennedy case. The two positions are entirely inconsistent with each other. If he still held her interest in the land as security for his liability on the appeal bond, he could not be the absolute owner of the land under any oral agreement, made as he claims.

But, if there was an oral agreement made in December, 1887, that he was to keep the land in payment of his claim against appellee, such agreement cannot stand, or be enforced against her, and if not absolutely void, is certainly voidable. When the agreement was made, he was, and had been for years, her legal adviser and attorney in reference both to this land, and to other property, and other matters in litigation. Judge Story in his work on Equity Jurisprudence (sec. 310) says: "The situation of an attorney or solicitor puts it in his power to avail himself, not only of the necessities of his client, but of his good nature, liberality and credulity, to obtain undue advantages, bargains and gratuities. Hence, the law, with a wise providence, not only watches over all the transactions of parties in this predicament, but it often interposes to declare transactions void, which, between other persons, would be held unobjectionable." In the case at bar, the testimony tends to show that the one-fifth interest of appellee in the 138.10 acres was worth from $1400.00 to $2000.00, and her mother, who had a life interest in this share, was then seventy-three years old. An agreement, if made by appellee, to allow appellant

to retain her land in payment of his legal services, was an agreement made while the relation of client and attorney existed, and was an agreement made in reference to the property as to which, in part, his legal services had been rendered. "It is a settled doctrine of equity that an attorney cannot, while the business is unfinished, in which he has been employed, receive any gift from his client, or bind his client in any mode to make him greater compensation for his services than he would have a right to demand if no contract should be made during the relation." "An agreement made by a client with his counsel after the latter has been employed in a particular business, by which the original contract is varied, and greater compensation is secured to the counsel, than may have been agreed upon, when he was first retained, is invalid, and cannot be enforced." (*Elmore* v. *Johnson*, 143 Ill. 513). In *Elmore* v. *Johnson, supra,* we said (p. 525): "The reason for the doctrine is to be found in the nature of the relation, which exists between attorney and client. That relation is one of confidence, and gives the attorney great influence over the actions and interests of the client. In view of this confidential relation, transactions between attorney and client are often declared to be voidable, which would be held to be unobjectionable between other parties. The law is thus strict, 'not so much on account of hardship in the particular case, as for the sake of preventing what might otherwise become a public mischief.'" In the same case it was also said: "The law watches with unusual jealousy over all transactions between the parties, which occur while the relation exists."

Appellant, years after the accounting was had upon December 26 and 27, 1887, took, in Chicago and perhaps at other points, certain depositions to sustain his contention, that appellee agreed to permit him to retain her interest in the land as payment for what was claimed by him to be due to him. Two of these witnesses were, the

one a young man who was studying law in his office in December, 1887, and the other, a brother of such young man who happened to come into the office. They testify that, when appellant obtained the money upon the draft or check, it was counted and passed over to appellee. Undoubtedly, as a mortgage was executed upon appellee's property by Riddell who held the title, it was necessary, to justify the execution of such a mortgage, to show that appellee received the money represented by it, and unquestionably the money may have been handed over to her, and counted by her or for her, but all this is perfectly consistent with her statement that she paid $541.23 of the money there and then to the appellant, and kept only $258.77 of it. Appellant held the title to the property by virtue of the indebtedness, claimed by him to have existed from her to him, and it is very natural that a young lad, not interested in the matter at all, and being, as is shown in this case, in another part of the room, should confuse the talk about the title of the property, as being in the appellant on account of an existing indebtedness, with a statement that he was to hold it in payment of that indebtedness. It is shown that one of these young men was indebted to the appellant in a note for the sum of $100.00, and the stenographer, who took their testimony, states that appellant was to release the witness from his liability on this note in consideration of his testimony given in the form of a deposition. Appellant also takes the deposition of one or two parties, who claim to have heard appellee admit that she had agreed to allow appellant to retain the land in payment of what was due him. One of these witnesses is impeached by three persons, who swear that his reputation for truth and veracity is bad; and their evidence, as well as that already mentioned, is contradicted in various particulars, not only by the testimony of appellee but by differences in their own statements. For instance, appellant states that appellee, when she found

that her indebtedness to him was as much as $793.00, or more than $800.00, said she preferred, as she was to get nothing, to let him have the land and let her keep the money. But one of the witnesses, alleged to have been present in the office on December 26 or 27, 1887, when the accounting occurred, says that, when she found that she was only to receive out of the $800.00 about $200.00, she made the statement that she was willing to let him keep the land. Appellant also introduces testimony of two young persons, who claim to have seen two rolls of money, one containing $500.00, and the other containing three $100.00 bills, in the possession of appellee in her dining room at her house on or about New Year's day 1888. These persons are contradicted by three or four witnesses, and, it being made clearly to appear that $100.00 of the $800.00 was handed over for some reason or other to Riddell and retained by him, she could not have had at the time mentioned more than $700.00 altogether.

The burden was upon the appellant, in view of the relation in which he stood to the appellee, to prove that the transaction was fair and honest and honorable. Any doubt as to its fairness must be resolved in favor of his client. Without making further comment upon the testimony, or the evidence introduced by him in the form of depositions to contradict the proof introduced by the appellee, we are of the opinion that his testimony fails to overcome the case made by the appellee. At any rate, the whole evidence leaves the mind in doubt as to the fairness of the transaction, and this being so, the doubt was correctly sōlved by the chancellor below in favor of the appellee.

It is contended by counsel for appellant that James C. Heustis, the husband of the appellee, was an incompetent witness, and that, as her husband, his testimony in her favor should have been rejected. This contention is without force, for the reason that, under section 5 of the act

in relation to evidence, the husband may testify for the wife where the litigation is concerning her separate property. Here, the litigation is concerning appellee's separate property, inherited by her from her father. It has been held by this court that, under the section referred to, the husband and wife may be witnesses for and against each other where the litigation shall be concerning the separate property of the wife. (2 Starr & Curt. Ann. Stat. —2d ed.—p. 1837; *McNail* v. *Ziegler*, 68 Ill. 224; *Funk* v. *Eggleston*, 92 id. 515). We do not think that the appellee was guilty of *laches* in the present case. The proof shows that she endeavored for years to induce appellant to deed back to her her property, and that she called at his office frequently when he would refuse to see her, or, learning that she was coming, would vacate the office in order to avoid her. There can be no question that the transaction, here sought to be reviewed, was originally a mortgage to secure a debt. The right to foreclose that mortgage would not be cut off until ten years had elapsed after the maturity of the mortgage. The note for $253.00 did not mature until February 5, 1886. The present suit was brought on September 17, 1894, less than ten years after the maturity of the debt secured by the mortgage. As the right to foreclose was not barred by the statute, the right to redeem was not barred, as the two rights are reciprocal. This court has often held that the right to redeem and the right to foreclose are reciprocal, and that, if the one is not barred, the other is not barred. (*Carpenter* v. *Plagge*, 192 Ill. 99, and cases there referred to; *Jackson* v. *Lynch*, 129 id. 72; *Locke* v. *Caldwell*, 91 id. 417).

The decree of the circuit court is affirmed.

*Decree affirmed.*