THE PEOPLE *ex rel.* W. H. Stead, Attorney General,

*v.*

RICHARD S. C. REAUGH.

*Opinion filed December 22, 1906.*

1. ATTORNEYS AT LAW—*attorney must inform court of betrayal of its confidence.* An attorney at law who learns that the views of the members of the court of which he is an officer, relating to the decision of a cause pending in said court and undetermined, which were expressed and recorded in the consideration of the cause in private conference, have either through wrongful methods or the treachery of some one necessarily entrusted with the secrets of the court become known to an outside party, who is using the information for his own advantage for the purpose of obtaining money from litigants, owes a duty to promptly inform the court of such conduct.

2. SAME—*suppressing the information of conduct tending to discredit court is cause for disbarment.* One who exercises the privileges granted to him as an attorney at law is under an obligation to maintain the respect justly due to the court of which he is an officer, and to furnish information of conduct tending to discredit the court or to create suspicion as to the integrity of its members, and

a failure to do so, without justification or excuse, is cause for disbarment.

3. SAME—*joining in scheme looking to control of court's decision is gross misconduct and warrants disbarment.* An attorney who, when informed by a certain person that the latter has, through the treachery or wrongful methods of one having confidential relations with a justice of the Supreme Court, obtained inside information as to the status of a cause then pending in such court, not only fails to inform the court of the fact, but acts as the agent of such person in submitting from him a proposition to attorneys in the pending case to control the decision thereof for a money consideration, is guilty of gross misconduct and should be disbarred.

INFORMATION to disbar.

W. H. STEAD, Attorney General, (EDGAR ELDREDGE, and JOEL C. FITCH, of counsel,) for relator.

NORTHCOTT, HOFF & ORR, and B. H. CANBY, (BENSON WOOD, of counsel,) for respondent.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

This is a disbarment proceeding, begun by information filed by the Attorney General. It is necessary to a fair understanding of the case that facts should be stated which, it is needless to say, would not otherwise be disclosed.

At the February, 1906, term there was pending in this court an appeal from the circuit court of Clay county entitled *W. H. Dillman et al.* vs. *Katherine McDanel et al.,* to review a decree of the circuit court of Clay county setting aside a will of William H. Hudelson. Printed briefs and arguments were filed by counsel for the respective parties, and the cause was also argued orally for appellants by Mr. B. D. Monroe and Mr. George B. Gillespie and for the appellees by Mr. Wheeler and Mr. Dawley. Justices Scott and Ricks were absent from the court by reason of illness and Justice Boggs did not hear the oral argument, so that the cause was heard and considered by only four justices. The case was then

considered in conference, and Justices Cartwright and Hand were of the opinion that the decree ought to be affirmed, but Justices Magruder and Wilkin were of the contrary opinion and thought it ought to be reversed. With that division and the number of justices present no decision could be reached. The views of the members who considered the case were noted in the private agenda books kept for that purpose by each of the justices, including the absent ones, and the case was assigned to one of the justices to make a careful and complete examination of the record and of the facts and questions involved, preliminary to another conference and consideration of the case. For the purpose of enabling each justice to make an examination of the case in connection with the abstract of the record and briefs and arguments in the hands of each justice it is the practice of the court to have the opinions printed and distributed to each justice. An opinion in this case was written, stating the evidence and issues and presenting the view that the decree should be affirmed. That opinion was sent to Hon. Isaac N. Phillips, official reporter of the decisions of the court, and copies were printed and distributed to the justices. No other copy of the opinion left the custody of the reporter. Nothing was done in the case at the April term. On May 26, 1906, a few days before the court convened for the June term, B. D. Monroe called upon Mr. Phillips and informed him that he had seen and read a copy of the opinion and desired to learn whether it was genuine. The original opinion was not shown to him and he obtained no definite information about it, and Mr. Phillips immediately reported to the court what Monroe had told him. The chief justice directed Mr. Phillips to have all the opinions returned, and to direct the request for the opinion sent to Justice Ricks to James Drennan, his secretary, for the reason that said justice was very ill and physically unable to attend to any business. The opinions were returned, and the one sent by Mr. Drennan bore undoubted evidence that it was the one which Monroe had seen. There was an

interview between the chief justice and Monroe, and from information obtained in that way, A. M. Rose, one of the counsel for appellees, J. H. Smith, one of the counsel for appellants, and Monroe, were called before the court in conference on June 6, 1906, and interrogated in respect to the matter. After refusing to disclose the names of the parties and being advised that they would be called before the bar of the court, the information was obtained that H. M. Bradford, a special agent of the Baltimore and Ohio Southwestern Railway Company, living in the city of Flora, in Clay county, had obtained the opinion, and had made a proposition through the respondent, Richard S. C. Reaugh, to the counsel for appellants, to have the opinion changed and the decree reversed in consideration of $10,000. Informations were then drawn by the Attorney General in accordance with the facts as stated to the court, one against H. M. Bradford for contempt, and the other against the respondent to show cause why his name should not be stricken from the roll of attorneys of this court. H. M. Bradford fled from the State and his employer found another field for the exercise of his talents, so that he was not apprehended and no definite information was secured from him as to the manner in which he obtained the opinion from Mr. Drennan. The respondent made answer to the information against him, and the issues of fact were referred to Mr. James H. Matheny to take the evidence and report his conclusions. He took the evidence and reported his findings of fact, with his conclusion that the respondent is guilty of the malconduct charged in the information and that his name should be stricken from the roll of attorneys. Respondent filed exceptions to the report and the cause was submitted for decision upon the briefs and arguments of counsel for the parties.

The information, after setting forth the admission of the respondent to the bar, the pendency of the case of *Dillman v. McDanel,* the argument and submission of the same to the court, and the writing, printing and distribution of the

opinion, alleges that Bradford met respondent in Louisville, Illinois, about March 16, 1906, and informed respondent that he knew how the justices of this court had voted; that two had voted to affirm the decree, two had voted to reverse, one did not vote and two were absent; that one of the justices was writing the opinion; that Bradford was close to parties connected with the court and had talked with such parties; that a change of one vote would make a change of the decision; that Bradford was then making a proposition to Rose, attorney for appellees, to prevent the opinion of the court being changed, proposing that if Rose would pay $10,000 the opinion would or could, through or partly through the efforts of Bradford, remain as it was and the decree be affirmed, and in order to convince Rose that he could carry out the deal he would show Rose a copy of the opinion and the case would go against appellees unless they or their counsel would make the deal; that on the next day Bradford informed respondent that the deal between him and the appellees and their counsel was all off because appellees could not raise the money, and Bradford then asked respondent if he supposed it would be of any use to make a similar proposition to appellants or their counsel; that on or about March 24, 1906, Bradford went to the office of respondent, in the city of Flora, and informed respondent that he did not believe anything could be done in regard to procuring appellees or their counsel to pay $10,000 for the purpose aforesaid, and asked respondent if he thought it would be safe for him, said Bradford, to see Monroe or Smith about it; that respondent consented, and agreed with Bradford that he would propose to appellants and their counsel to procure a change in the decision of the court in favor of appellants if appellants or their counsel would pay to respondent and Bradford, or either of them, $10,000; that on the next day respondent requested Smith to come to his office in the city of Flora; that Smith went to said office and respondent informed him that the decree had been affirmed

and the case was in such condition that for $10,000 it could be changed, and if Smith would procure a draft for $10,000, payable to Smith or his clients or Monroe, and deposit the draft, without endorsement, in a certain safety deposit vault, the original opinion would be shown to Smith and Smith and Monroe could read it, and if the case was reversed the draft for $10,000 should be endorsed and delivered to the respondent; that respondent requested Smith to make said proposition to Monroe and appellants and to inform him by telephone whether the proposition was received favorably or unfavorably, and that on the next day Smith telephoned respondent that Monroe and appellants had received the proposition favorably, and on the following day respondent informed Bradford that he had submitted the proposition as requested and Smith had advised respondent over the telephone that the proposition had been received favorably.

Nearly all the facts alleged in the information are admitted by the answer and are not in controversy. After admitting the allegations of the information as to the admission of respondent to the bar, the pendency of the suit, the hearing and taking under advisement of the cause, the writing and printing of the opinion and distribution of the same, the answer admits the following facts: That during the March term of the circuit court of Clay county Bradford met respondent and informed him that he (Bradford) was close to parties connected with this court and had talked with said parties lately, and knew that a change of one vote would make a change in the decision of the court; that Bradford said he was advancing a proposition to Rose to prevent the opinion being changed, and if Rose and his clients would pay $10,000 to Bradford the judgment would or could, through the efforts of Bradford or partly through his efforts, not be changed, and Bradford, in order to carry out the deal, had offered to show Rose a copy of the opinion, and the case would go against appellees unless the deal was made with him; that the next day Bradford again saw re-

spondent and said that the deal was off because appellees could not raise the money, and he asked respondent if he supposed it would be of any use to make a similar proposition to appellants; that Bradford afterward came to the office of respondent, in Flora, and said that he did not believe anything could be done to make appellees pay him $10,000, and asked respondent if he thought it would be safe for him (Bradford) to see Monroe or Smith; that he agreed with Bradford to lay the proposition before Monroe and Smith, and subsequently did so, and requested a reply whether it was received favorably or unfavorably, and that he received the reply that it was received favorably. The answer alleges that respondent had never seen the opinion, but had been informed by Monroe that Bradford had shown him what appeared to be an opinion of the court and he had found that the copy of the opinion was genuine. The answer denies that the respondent consented with Bradford that he would propose to appellants to obtain a change in the opinion for $10,000, but avers that he promised Bradford he would lay the matter before Monroe and Smith; that within a few days after that interview with Bradford he requested Smith to come to his office in Flora; that Smith came, but respondent did not inform him that the case was in such a condition that for $10,000 it could be changed, or that if Smith would procure a draft for $10,000 to be endorsed and delivered to respondent an opinion would be shown and a change made as proposed. The answer alleges that respondent had already formed an intention to advise Monroe and Smith of what was being done, and avers that he did not make the statements as being true of his own knowledge, but as having been told him by a party who said his information was reliable; that his statement to Smith was that the party had said he could procure an opinion and would show it to them, and he wanted respondent to sound them and to ask them to inform respondent whether they regarded the matter favorably or unfavorably. The justification set up by the

answer is, that all that was done by respondent was done with a view to learning the source of Bradford's information; that his purpose was to obtain more definite information as to the facts, and that his motive was to assist Monroe and Smith in the cause, and to investigate, as State's attorney, the improper attempt to commit a contempt of the court or to violate the laws of the State.

It will be seen that the only disputed question of fact is whether the respondent, in submitting the proposition to Smith for the consideration of appellants and their counsel, acted for himself as well as for Bradford, or whether it was submitted by him as a proposition of Bradford, in which he had no interest and with a proper object in view. The whole transaction and proposition was infamous. The information as to the consideration of the case and the views of the members of the court could only be obtained from the private books of the justices, and the opinion could only be obtained by base and shameful methods or the treachery of some one necessarily entrusted with the secrets of the court. No court can adopt methods for doing business which in themselves will afford protection against such conduct or treachery, and it is the manifest duty of every attorney to furnish prompt and direct information to the court of such conduct. A failure to do so would call for disbarment of an attorney, and unless the respondent has shown sufficient justification or excuse for his participation in the offer his name should be stricken from the rolls. The conclusion of the commissioner was that the respondent made the proposition to Smith and that it was received by Smith and appellants as an actual working proposition, and in considering whether that finding is correct it becomes necessary to state the circumstances of the transaction as proved by the evidence.

After the cause was argued and submitted, and some time in the week beginning March 12, respondent met Bradford at the Metropolitan Hotel, in Louisville, where the circuit court was in session. Bradford informed respondent

that he was there on a big matter in reference to the Hudelson, will case and was going to meet a party about it that evening. Bradford and respondent occupied the same room at the hotel that night, and Bradford then told respondent that he had been talking to Rose about the will case; that McDanel was there and they were considering the matter and he was to meet them again the next day; that he was close to parties connected with this court and had talked with them lately, and knew the court was evenly divided and the decision could be changed; that the decision as it then stood was against the will, and that two of the justices were sick and he understood the decision could be changed. Respondent asked Bradford what he was trying to do, and Bradford said that he had advanced a proposition to Rose that he would procure a decision for appellees. Respondent expressed some surprise, and Bradford said that he was close to parties connected with the court, and in order to convince Rose and McDanel he had proposed to show a copy of the opinion before it was filed, and the case would go against them unless they could make some deal. Respondent expressed disbelief that any member of the court could be purchased, and Bradford said that some of the justices had to have their opinions written for them and something could be done that way. The next day Bradford told the respondent the deal was off,—that the appellees could not raise the money,—and he asked the respondent if he thought it would be of any use to tackle the other side. Respondent said he did not think it would be any use and he had better drop the matter. Bradford afterward came to the respondent's office in Flora and said that he did not think anything could be done with McDanel and asked if the respondent thought it would be safe to see Monroe and Smith, and the respondent said he thought not, and Bradford then asked if the respondent would see one or the other of them. He said he would give no names but was close to parties in Taylorville, where Judge Ricks lived. He wanted the respond-

ent to ascertain the attitude of Monroe, Smith and Dillman as to whether they would entertain the proposition, and to propose that if they would accept the proposition he would get a copy of the opinion before it was filed. He said that respondent could tell them that the matter of payment could be arranged so that nothing would be paid until the opinion was filed, but that it must be made safe; that a draft could be made payable to any one and need not be endorsed until the opinion was handed down, and that the money would be cut up among several, and they would probably want it put up in St. Louis. Respondent agreed to sound Smith but expressed the opinion that it would be of no use. The next day Bradford came again to respondent's office and told him to see Smith, and respondent agreed to do so. That was the latter part of March, before this court convened for the April term. Respondent called Smith up on the telephone and asked him to come over to Flora. When Smith arrived another person was in the reception room, and after he left respondent closed the door which led into the hall from the reception room, which closed with a spring lock, and they went into the private room. Respondent asked Smith what he knew about the case, and Smith said he was afraid it was against them; that two justices had voted to affirm, two had voted to reverse, Justice Boggs had not voted and two justices were absent; that Monroe had found out which justice was writing the opinion; that he wanted to send some papers to the justice who was writing it and the clerk told him who it was. Respondent then communicated the proposition of Bradford to have the opinion changed for $10,000, and told Smith that he was not getting anything out of it and his only object was to put them on their guard. He expressed an opinion that the thing could not be done, and asked Smith to talk with Monroe and answer the word "favorable" or "unfavorable" over the telephone. Respondent refused to give the name of the party making the proposition, but stated that his informant told him that for $10,000

a reversal of the decree could be had; that his informant said he was close to some member of the court and an opinion would be shown them, and after they had seen it and satisfied themselves of its genuineness, if they would pay $10,000 an opinion would be written reversing the decree; that a draft should be made payable to Smith or his clients or Monroe and deposited in the safety deposit vault of the First National Bank of Flora, and when they were satisfied with the result the draft was to be endorsed and delivered, and in the meantime the party making the offer, and appellants, were each to carry a key to the safety deposit box. Monroe went to Louisville in answer to a telegram from Dillman, and he and Smith and Dillman had a consultation lasting about two hours, in which the feasibility and practicability of the proposition was discussed pro and con from every standpoint. At the conclusion of the conversation Smith called respondent over the telephone and gave him the word "favorable," and this information was communicated by respondent to Bradford. At that time Smith told Monroe that he wanted nothing more to do with the proposition, and that whatever his client chose to do he could do. After Monroe had returned from his interview with Mr. Phillips he went to Flora to the office of respondent and told him that Bradford had been at Louisville and had shown Rose and himself the opinion of the court and that it affirmed the decision. He then asked respondent who his informant was, and respondent said it was Bradford. At the time of this transaction the case had not been finally considered by the court in conference and no decision had been reached.

At his examination before the commissioner Monroe testified that he had requested respondent to assist in unearthing the matter and digging it up, and that respondent, in what he did, acted in apparent good faith with the motive of unraveling the transaction, but he said that that fact had not made any impression upon his mind at the time and he did not think he disclosed it to the court when making his

statement in the conference. It is quite apparent from his testimony that there was a progressive shrinking of the successive statements made by him, and it is also apparent that the only motive which animated him did not relate to the court or the conduct of Bradford, but that his object was to obtain a re-argument or rehearing of the case before the court, into which three new members had recently come. Although he gave the first information to the official reporter that an opinion in the case had been exhibited to him, he refused to disclose the names of the parties connected with the transaction or to afford any aid to the court until the names had been disclosed by another party and he had been re-called before the court. He suppressed the connection of both Bradford and respondent with the affair. The evidence does not show that Monroe thought respondent's proposition was one that could not be acted upon. It certainly did not strike him in that way when he was holding the consultation with his client as to the feasibility of it, and while what occurred at that consultation is not evidence against the respondent, it is important as bearing on the understanding of Monroe and Smith as to whether the proposition was merely for the purpose of obtaining information upon which to prosecute somebody or to aid the court in some way. Smith, in his testimony, said that his impression was at the time that the information came through some secretary of a member of the court, and that respondent desired a favorable answer so that he could obtain further information, and that he did not think respondent had any guilty intent. He admitted, however, that at the conference hearing he refused to give respondent's name to the court, and gave as a reason that he felt under obligations not to injure him. If he understood that respondent, in making the proposition, was merely seeking further information concerning the corrupt scheme with a view to a prosecution or the protection of the court, it seems that he would not have refused to inform the court of such praiseworthy conduct.

But aside from such questions as that, there is no dispute of the fact that respondent never did a single act to prevent the consummation of the scheme and never gave any information about it. When he learned, in March, from Bradford that the confidence of the court had been abused and betrayed and its secrets divulged, he had all the information that was necessary to enable him to bring the matter to this court. He took no step in the matter as State's attorney of Clay county, and his counsel now say that it is extremely doubtful whether Bradford could have been prosecuted, since it nowhere appears that he intended to use the money to bribe or corrupt any member or officer of the court, and that the means Bradford had in mind were perhaps not improper or unlawful. Whether Bradford could be prosecuted in Clay county or not, there was no reason whatever why respondent should not have given some information or admonition to this court that Bradford, and perhaps some other person, had been guilty of contempt. He gave the court no such information, and, so far as he knew, Bradford did not abandon the scheme until Monroe had seen the opinion, and respondent, upon meeting Bradford, asked him how the proposition was getting on. Bradford then said that he was not going to do anything with it. Respondent asked him why, and Bradford said that Gillespie had been talking to Drennan. It is clear that respondent did not participate in the transaction for the purpose of preventing or punishing contempt of this court or bringing anybody to justice.

A ground alleged in justification of respondent's conduct is that he felt an interest on the side of Monroe and Smith in the will case, and for that reason, and on account of his friendship for the attorneys, he submitted the proposition only as a friendly warning against the danger of some deal being made with the other side. He told Smith when he submitted the proposition that he feared the other side had been or might be seen, and said that he had better investigate and watch, as something of that kind might be done. He

did not tell Smith of the direct negotiations which Bradford said he had carried on with Rose and that it was all off because appellees could not raise the money, but if he, in fact, submitted the proposition merely to let Monroe and Smith know that a scheme was afoot and a bargain might be made with the other side, that would not excuse him for a failure to discharge his duty, as an officer of this court, by giving the court some information on the subject. The only excuse he offers for not bringing the matter to the attention of the court is that he understood Monroe would do so; but that was after May 26,—more than two months after he was possessed of the necessary information. Although he expressed the belief that the scheme would not be successful, we agree with the commissioner that the proposition was submitted by respondent as an actual working proposition, and that no justification appears for the participation of respondent in the transaction.

The exceptions to the report of the commissioner are overruled and respondent's name will be stricken from the roll of attorneys of this court.    *Rule made absolute.*