JENNIE DOUGLASS, Appellee, *vs.* M. C. TREAT *et al.* Appellants.

*Opinion filed October 28, 1910.*

1. APPEALS AND ERRORS—*when a decree canceling oil lease involves a freehold.* A decree canceling as a cloud on title an oil and gas lease, which is for a term of years and "as long thereafter as oil or gas, or either of them, is produced" by the lessee, involves a freehold.

2. FRAUD—*when equity will relieve party injured by false representation.* Although the parties to a contract are dealing at arm's length and there is no fiduciary relation, yet if one party asserts, as a matter of fact, a material thing which he knows or ought to have known was false, with the intention and expectation that his assertion will be relied upon and acted upon by the other party, who does rely and act thereon to his injury, equity will grant relief to the injured party by setting aside the contract.

3. SAME—*representation as to bonus being paid for oil leases is a representation of fact.* A representation by an agent of an oil company to a non-resident land owner, who was ignorant of the facts, that the highest bonus being paid for oil leases in the vicinity of her land was $10 an acre when it was in fact, and so known to the agent, much greater, is a false representation of a material fact such as amounts to fraud, and not merely an expression of opinion as to value.

4. SAME—*principal cannot shield himself behind agent's ignorance.* If the field representative of an oil company knows approximately what a certain oil well will produce per day the company is charged with his knowledge, and it cannot escape responsibility for a misrepresentation of the fact by an uninformed agent selected to negotiate with a non-resident land owner for an oil lease, even though the agent may not have known, although he assumed to know, what the output of the well would be.

APPEAL from the Circuit Court of Marion county; the Hon. A. M. ROSE, Judge, presiding.

L. B. DENNING, and KAGY & VANDERVORT, for appellants:

A misrepresentation which will warrant a court of equity in setting aside a contract must contain the following ele-

ments: First, its form must be a statement of fact; second, it must be made for the purpose of inducing the other party to act; third, it must be untrue; fourth, the party making the statement must know or believe it to be untrue; fifth, the person to whom it is made must believe in and rely upon the truth of the statement; sixth, the statement must be material. *Gillespie* v. *Oil Co.* 236 Ill. 198; *Prentice* v. *Crane,* 234 id. 302; 2 Pomeroy's Eq. Jur. sec. 876.

A lessor who alleges the lease was obtained by fraud and misrepresentation has the burden of proving such allegation by proof so clear and cogent as to leave the mind well satisfied of its truth. *Gillespie* v. *Oil Co.* 236 Ill. 188.

Even in those cases where fraud has been exercised a court of equity will not set aside a contract made by parties on an equal footing, where the state of the proof is such that to grant the relief is as likely to be wrong as right. *Gillespie* v. *Oil Co.* 236 Ill. 188.

A misrepresentation must be an affirmative statement or an affirmation of some fact, in contradistinction to a concealment or failure to disclose and to a mere expression of opinion. 2 Pomeroy's Eq. Jur. sec. 877; *Williams* v. *Wilson,* 101 Ill. App. 541.

As distinguished from false representation of a matter of fact, the false representation of a matter of intention, although it may have influenced the transaction, is not a fraud in law, nor does it afford a ground for relief in equity. *Murphy* v. *Murphy,* 189 Ill. 360.

It is not sufficient to allege fraud generally for the purpose of assailing a transaction on that ground, but the complaining party must state in his pleading and prove on the trial the specific acts or facts relied on as establishing the fraud. *Roth* v. *Roth,* 104 Ill. 35.

Where no fiduciary relation exists, mere inadequacy of consideration raises no presumption of fraud or undue influence. 10 Ill. Cyc. Digest, 1239; 2 Pomeroy's Eq. Jur. sec. 926.

It is error for the court in the decree to find facts not according to the allegations in the bill and wholly unsupported by the proofs, and unless the bill states sufficient facts to warrant the decree it cannot stand. *Smith* v. *Brittenham,* 98 Ill. 188.

False and fraudulent affirmations as to value are mere matters of opinion and not actionable. *Gordon* v. *Butler,* 105 U. S. 553; *Holbrook* v. *Connor,* 60 Md. 578.

WILLIAM F. BUNDY, and NOLEMAN & SMITH, for appellee:

Where the property which is the subject matter of the contract is at a remote distance and the representations made concerning it are from their nature such as may be assumed to be within the knowledge of the party making them, the party to whom they are made may rely on them as to any material fact, and even as to the value and capabilities of the subject matter of the contract. *Borders* v. *Kattleman,* 142 Ill. 96; *Hicks* v. *Stevens,* 121 id. 186.

Where a party ignorant of the real facts, and having no ready means of information, makes a purchase or enters into a transaction as to the subject matter of which representations have been made which are material, the law will presume that, as a matter of fact, he relied on them. *Hicks* v. *Stevens,* 121 Ill. 186; *Ladd* v. *Pigott,* 114 id. 647.

A person is not free from fraud in a court of equity when he makes a positive representation of a material fact which he does not know to be or has good reason to believe is true, and which, in point of fact, is false. It is not indispensable to a right to rescind a contract that the party making the representation knew it to be false, provided it is material and the other party had a right to rely upon it, and did so, and was deceived. *Hicks* v. *Stevens,* 121 Ill. 186; *Coolidge* v. *Rhodes,* 199 id. 24; *Allen* v. *Hart,* 72 id. 104.

. As a general rule, representations as to the value of the property, though exaggerated, do not constitute fraud; but it has some exceptions, one of which is, that false assertions of opinion will amount to a fraud where made under circumstances that the other party has a right to rely on them without bringing his own judgment to bear. *Coolidge* v. *Rhodes,* 199 Ill. 24; *Hicks* v. *Stevens,* 121 id. 186; *Murray* v. *Tolman,* 162 id. 417.

In chancery it will be presumed that the court considered and acted only upon such evidence as may be proper. *Hicks* v. *Stevens,* 121 Ill. 186.

It is immaterial whether a party misrepresenting a material fact knows it to be false or makes the assertion of the fact without knowing it to be true, for the affirmation of what one does not know to be true is unjustifiable, and if another acts upon the faith of it, he who induced the action must suffer, and not the other. *Borders* v. *Kattleman,* 142 Ill. 96.

Where representations are made concerning values, with the intention that they shall be understood as statements of fact and not as the expression of opinions, they will constitute fraud. *Leonard* v. *Springer,* 197 Ill. 532; *Allen* v. *Hart,* 72 id. 104.

One guilty of fraudulent conduct, whereby he induces another to act to his prejudice, cannot be allowed to impute negligence to the latter as against his own deliberate fraud. *Leonard* v. *Springer,* 197 Ill. 532; *Ladd* v. *Pigott,* 114 id. 647; *Ruff* v. *Jarrett,* 94 id. 475.

Even where parties are dealing at arm's length, if one of them makes to the other a positive statement upon which the other acts, with the knowledge of the party making such statement, in confidence of its truth, and such statement is known to be false by the party making it, such conduct is fraudulent, and from it the party guilty of fraud can take no benefit. *Leonard* v. *Springer,* 197 Ill. 532; *Linington* v. *Strong,* 107 id. 295.

Mr. CHIEF JUSTICE VICKERS delivered the opinion of the court:

Mrs. Jennie Douglass filed a bill in the circuit court of Marion county against M. C. and E. M. Treat and George W. Crawford, doing business as partners under the name of Treat & Crawford, for the rescission of an oil and gas lease, on the ground that she was induced to execute said lease through the fraud and false representations of the defendants. Upon a hearing in open court upon the bill, answer and proofs, the issues were found for complainant and a decree was entered canceling the lease as a cloud upon complainant's title. The lease being for the term of two years from the date thereof, and "as long thereafter as oil or gas, or either of them, is produced" by the lessee, a freehold is involved, and defendants below have appealed direct to this court.

The only error seriously insisted upon is that the evidence is not sufficient to support the decree below.

The lease in question was executed by the appellee on July 19, 1909, in the city of Evanston, in the State of Wyoming. Appellee owns fifty acres of land on the north side of the village of Sandoval, Marion county, Illinois, twenty acres of which is within the corporate limits of the village and thirty acres adjoins the city limits on the north. Prior to June, 1908, appellee and her husband resided in Sandoval. Her husband died there some time in the spring or early summer of that year. On June 26, 1908, appellee left Sandoval and went to reside with her sister and brother-in-law, Mr. and Mrs. Zipf, in Evanston, Wyoming. Appellee remained with her sister in Wyoming until the lease in question was executed, July 19, 1909. During the summer and fall of 1908 attention was attracted to the vicinity of Sandoval as a prospective oil field. Some wells were put down, the first of which that showed any signs of oil being known as the "Dykstra well," which struck oil sand in September, 1908. This well did not, however, prove to

be profitable. Later another well, known as the "Stein well," was put down to a depth of fourteen hundred feet and struck oil sand that was considered by oil men to contain oil in paying quantity. The oil sand found at the fourteen hundred foot level is referred to as the "Stein sand." After this strike a great many persons interested in oil came to Sandoval and the excitement resulting from the showing in the Stein well caused some activity in procuring oil leases, for which, in some instances, substantial bonuses were paid in addition to giving the land owner a royalty of one-eighth or one-sixth of the oil that might be produced from his land. Subsequently other wells were put down which proved to be "dusters" or dry holes. The little flurry of excitement resulting from the showing in the Stein well gradually passed away and most of the oil men abandoned the field. Among those who remained and continued to prospect the field was the Southwestern Oil and Gas Company, which had a lease on one hundred and fifty acres of land belonging to A. E. Benoist, about one mile north of Sandoval. The Southwestern Oil and Gas Company sunk a well on the Benoist land during the spring and summer of 1909. At about the fourteen hundred foot level the Stein sand was found in the Benoist well. Not being satisfied, the Southwestern Oil and Gas Company decided to sink the well deeper. It went through the Stein sand, and at a depth of fifteen hundred and thirty feet found an oil sand, which is referred to in the record as the "Benoist sand," which was unusually rich in oil. This strike was made some time in the early part of July, 1909. The well gave every indication of being a great producer before it was shot, which occurred about six o'clock in the evening of July 14, 1909. After the Benoist well was shot, oil in great quantities was thrown out at the top of the hole and it has continued to be a profitable gusher since. Reports of the Benoist strike spread rapidly and the oil men who had abandoned the field immediately returned. Up to the time

of the trial of this case the output of the Benoist well had not been accurately determined, but from the evidence of oil experts it is probably between five hundred and seven hundred barrels every twenty-four hours. This quantity of oil flows out at the top without the aid of pumps.

Appellants were represented in this field by Mr. Whiting. Up to the time the Benoist well was shot they had confined their operations merely to securing leases, whether for speculative purposes or for development does not appear nor is it material. A. E. Benoist is the father of A. L. Benoist, a young man twenty-five years of age, who resided with his father at the time the well was put down on the Benoist farm. A. E. Benoist was cultivating a portion of appellee's land, which lay south of his farm. A day or two before the Benoist well was shot but after the oil sand had been found, Mr. Whiting, agent of appellants, spoke to young Benoist about engaging him to make a trip to Wyoming to procure a lease from appellee upon her fifty acres of land. No definite arrangements were made, however, until on the evening of July 14, after the well had been shot. About 8:30 or 9:00 o'clock on that evening Mr. Whiting sent for young Benoist to come to his hotel in Centralia. Mr. Benoist drove over to Centralia and saw Mr. Whiting in his room in the hotel. Here Mr. Whiting arranged with young Benoist to leave on the first train for Evanston and furnished him with money to pay his expenses and with blank leases, and authorized him to go to Evanston and offer the appellee a bonus of $500 for an oil lease and one-eighth of the oil, and $50 for gas that might be found under her land. A. L. Benoist left Sandoval the next morning at 5:14 o'clock and arrived in Evanston on Sunday, July 18, about three o'clock in the morning. Mr. Benoist called on appellee at her sister's home early Sunday morning. He spent most of the day visiting at the Zipf home but did not attempt to transact any business, nor did he make it known that he was there for the purpose of se-

curing a lease of appellee's land. About the time he was leaving on Sunday afternoon he said to appellee that he had a little proposition to submit to her from some oil men but would not discuss it at that time because it was Sunday, but promised to return on Monday and talk the matter over. On Monday Mr. Benoist went again to the Zipf home and visited with the family until late in the afternoon before anything was said about the lease. Late in the afternoon the subject of the execution of the lease in question was taken up and discussed for two or three hours before the lease was finally executed. Mr. Zipf and his wife, appellee and young Benoist were all witnesses and testified in open court to the statements made before and at the time the lease was executed. The substance of the testimony is that Benoist was very anxious to secure the lease and urged appellee to execute the same; that he told her everybody had leased except a Mr. Stiles, and he was going to lease the day he left home; that the bonus he was offering her was as much as any that had been paid and far above the average; that his father had leased a part of his farm to Treat & Crawford without any bonus, and that $10 per acre was as much as had been paid for any lease. Appellee had no information regarding the Benoist well except what she received from the appellants' agent. Young Benoist told appellee that oil had been struck on his father's place. He said that the well had been shot, and that oil men told him before he left that the well would produce from forty to fifty barrels per day. He said that the Stein well had about exhausted itself. He told appellee that the Warfield well was a duster. He testified that he told appellee that Mr. Fox had expressed the opinion that the Benoist well would produce one hundred and thirty-five barrels of oil per day, but in this statement he is not borne out by other witnesses who heard the conversation.

Appellee testified that she had known young Benoist in Sandoval and that she had every confidence in him and re-

lied on his statements as to the prices being paid for oil leases and as to the quantity of oil the Benoist well would produce. She had not been in Sandoval since she left there in June, 1908. She left no relatives there and had no means of keeping in touch with the progress of oil developments in that vicinity. She had heard conflicting reports about the prospects but had very little reliable information concerning the actual situation. Appellee told Benoist that she had received a higher offer than he had made, which she had declined because she had thought of selling her land and did not care to encumber it with a lease. Benoist said that Treat & Crawford were a very wealthy concern; that they represented $17,000,000 capital; that they were on the ground with machinery and ready to begin sinking wells; that they were able to prosecute the work of prospecting vigorously, and that appellee would get quicker and better results by leasing to his principals at the price offered than she would if she leased at the higher offer to other parties. A large number of witnesses testified that after the Benoist well was shot a lease on appellee's land, such as the one in question, was worth from $50 to $100 per acre. This evidence is not contradicted except by Mr. O'Donnell, an employee of appellants, who testified that in his opinion the price paid appellee was all the lease was worth. The evidence shows that before the Benoist well reached the Stein sand $30 to $35 per acre was being offered for leases and that some were taken at those figures. These leases provided for the payment of one-sixth of the product as royalty in addition to the bonus. Immediately after the Benoist well struck oil, leases went up to from $50 to $60 per acre, and after it was shot and proved to be a gusher leases went still higher, some of them bringing above $100 per acre as a bonus. Some time before the lease in question was executed one lease was executed on eighty acres for $1000 and another on forty acres for $1000. A Mr. Secor leased eighty acres at $100 per acre, and

Mr. Charles B. Ellis got over $10,000 for one hundred and eighteen acres.

There can be no doubt, under the evidence, that appellee's land could have been readily leased for from $50 to $75 per acre on the day that appellants obtained this lease. It is clearly established that Benoist represented to appellee that the price he was offering her was as much as any persons in the neighborhood were obtaining for similar leases; that he urged her to accept it on the assurance that she would make a great mistake if she did not lease to appellants. Appellee wanted to take further time to consider the matter, but Benoist insisted that he must leave on an early train the following morning, and that unless she executed the lease that evening she would lose her opportunity of leasing at all. The representation as to what bonuses were being paid in the neighborhood of appellee's land was a representation of a matter of fact and not the expression of an opinion. While it is true that statements as to the value of property are ordinarily considered as mere expressions of opinion and are for that reason not sufficient to warrant a court in rescinding a contract even though they were false and relied upon by the other party, yet the rule is otherwise where the misrepresentation relates to some specific extrinsic fact which materially affects the value, and in such case, if the fact is one peculiarly within the knowledge of the party making the statement and the statement is made with a knowledge of its falsity or what the law regards as the equivalent thereto, and with an intent that it shall be acted upon, and it is acted upon to the injury of the other party, such representation will amount to such fraud as will warrant a court of equity in setting aside any contract induced, in whole or in part, by such representation. (20 Cyc. 59; *White* v. *Sutherland,* 64 Ill. 181.) In the *Sutherland case,* just cited, a party sold a tract of land for $20 per acre and represented that $20 was the price which such lands were selling for in the neighborhood. This was untrue. Lands of the character of those

sold were only worth $10 per acre in that neighborhood, and the land involved was not worth above that amount. This was held to be a representation of fact and not the expression of an opinion, and the other necessary elements of a fraudulent representation being present, this statement, in connection with others, was held to be actionable fraud.

In reference to the representation as to the output of the Benoist well we think the evidence abundantly shows that there was a misrepresentation made to appellee. It may well be doubted whether young Benoist knew that the output of the well on his father's farm was much greater than he stated it to be to appellee, but there can be no reasonable doubt that Mr. Whiting knew, approximately, what the well would produce. In fact, it is proven that he said it was the most wonderful well he had ever seen, and the field from that time on certainly was an oil field. If Whiting knew the truth at the time this lease was executed, appellants cannot be permitted to reap the benefits of a fraud practiced upon the appellee because they selected an uninformed agent to secure this lease. Again, if Benoist did not know the output of the well he should not have assumed to know and sought to impress on appellee's mind that it would only produce forty or fifty barrels per day. While there was no fiduciary relation existing between the parties to this transaction and they were dealing at arm's length, still in such case, if either party asserts, as a matter of fact, a material thing which he knows or ought to have known was false, with the intention and expectation that the other party will rely and act upon the truth of such statement, and it is believed and acted upon to the injury of the other party, equity will relieve the injured party. Within the requirements of this rule appellee has sustained her case as stated in the bill. There was therefore no error in granting her a rescission of this contract.

The decree of the circuit court of Marion county will be affirmed.

*Decree affirmed.*