**HUSH et ux. v. REAUGH et al.**
**No. 864.**

District Court, E. D. Illinois.
June 7, 1938.

Smith & Murray, of Centralia, Ill., for defendants.

Clyde L. Todd, of Chicago, Ill., and Allen, Dalbey & Foreman, of Danville, Ill., for plaintiffs.

LINDLEY, District Judge.

Plaintiffs, husband and wife, residing in Columbus, Ohio, brought this suit in equity against defendants, residents of Clay County, Illinois, to set aside a quit claim deed executed by plaintiffs and delivered to Richard S. C. Reaugh, the deed having been made at the latter's request to DeLong, and to vacate likewise subsequent conveyances by DeLong to Richard Reaugh, son of Richard S. C. Reaugh, and by him to Riggle, and a tax deed held by defendant Dillman. The land, consisting of 140 acres, is located in Clay County, Illinois.

Plaintiffs aver that the deed was obtained by the elder Reaugh by means of his fraudulent concealment and misrepresentations, for the sum of $100; that the land is of the value of $20,000; that as a result of the fraud, the conveyances should be rescinded and the tax deed set aside, as void under the statutes of Illinois. Plaintiffs also attack an oil lease executed and delivered by the elder Reaugh to the Pure Oil Company, subsequently ratified by Riggle, nominee of Reaugh, on the ground that the Pure Oil Company's title is invalid because of the fraud of Reaugh. Reaugh' and his associates deny fraud in the procurement of the deed and the Pure Oil Company avers that it had no knowledge of any fraud; that it is not bound by the fraud, if any existed, and that its oil lease, therefore, is impervious to attack.

Hush, prior to 1926, had been employed on a railroad and had lost one of his hands. In 1926 he purchased, first, a 17

acre tract of land lying near Clay City, on which he made his home and, second, the 140 acres three and one-half miles from Clay City in Section 26, assuming a mortgage, later paying approximately $1,000 thereon and reducing it to approximately $1,100. He lived in Clay City from February, 1926, to August, 1934. During this period he raised fruit and poultry on his home place. Of the 140 acre farm, 120 acres were largely timber and approximately 20 acres only were cleared and fit for cultivation. During these years, he cut and sawed most of the marketable timber. He knew the elder Reaugh, employed him as an attorney for the purpose of examining an abstract and says that he supported Reaugh in the latter's candidacy for public office. Reaugh served as county judge and has been state's attorney. He was disbarred from the practice some years ago, the report of the proceeding appearing in People ex rel. v. Reaugh, 224 Ill. 541, 79 N.E. 936.

While Hush still lived in Clay City, suit for foreclosure was begun against him by the bank which held the mortgage upon the 140 acres. He and his wife were served with process and the cause proceeded to a decree of foreclosure and sale. However, no sale was ever had. The 17 acres upon which he lived, he surrendered to the mortgagee. When he left Illinois he had no means. He had sold the marketable timber on the land, had lost his home and the foreclosure proceeding against the 140 acres was pending.

In this condition, in 1934, Hush moved to Columbus, Ohio, where he has since lived. His wife did not follow immediately but joined him within a few months. They lived together for some two years thereafter, then separated and finally were divorced. She has been an invalid, seriously afflicted with arthritis, for the past six years. Hush, since his removal from Illinois, has had no steady employment but has worked a portion of the time on WPA projects. He apparently considered the 140 acres of no value over and above the mortgage and gave no further attention to it or to the decree. The bank had taken a judgment against him upon a note, in addition to the mortgage indebtedness, for some $1,400 and this judgment stood as a lien upon the land, subject to the mortgage.

Sometime in the year 1935, the inhabitants of Clay County became interested in the prospects for oil and from that time thence the interest grew and persists. As the activities progressed, paying wells came in. The time of this development is significant in this litigation. Reaugh was an abstracter and prepared numerous abstracts of title for the Pure Oil Company, who obtained many oil leases upon lands in the county. Ordinarily, drilling was not begun until the abstracts were completed. In 1936, in the fall, Reaugh made an abstract on the Weiler land southeast of Clay City, one and a quarter miles northeast of the Hush land. He knew, then, that there was a derrick on it. He made abstracts for other tracts on various sides of and near the Hush land including properties in Sections 26, 27 and 28. He made eight or ten abstracts of titles for land in this territory in the fall of 1936, kept a set of abstract records and entered all recorded transactions therein, including leases and conveyances of minerals. Oil scouts approached him for an oil lease on the land conveyed by Hush in the early part of 1937. One Kelly asked if he would accept $30 per acre for the lessor's royalty. He replied that he would consider $50. He knew that in the fall of 1936, Mrs. Chaffin, whose land adjoined that of Hush, had received $10 an acre for one-half of the royalty on her land. He represented Mrs. Chaffin when she executed the lease in his office. He knew of the Travis oil lease in Section 28. He knew of the sale of one-half of the one-eighth royalty in Section 28 in October, 1936, and knew that in January and February, 1937, one-half interest in the royalty in the Shannon Holman farm south and east of Clay City sold for $10 per acre, and that a one-half interest in the royalty in the Taylor farm of 240 acres in Section 27 was sold in the summer of 1937 for $24,000. This land joined the Hush land and the purchase was on the basis of $48,000 for the entire one-eighth royalty interest, or $200 per acre. He knew of the sale of a one-half royalty interest in 240 acres in Sections 28 and 29 on July 10, 1937, to the Standard Oil Company of Ohio, on the basis of $72,000 for one-eighth royalty interest, and of various other leases and sales of royalty interests in the fall of 1936 and early in 1937. The Weiler well, approximately one and a quarter miles from the Hush land came in as a producing well on February 26, 1937. He says he did not know at first that it was a paying profitable well but was aware of

the fact that it had been reported that oil had been found.

From all the testimony it appears that Reaugh had opportunity to know and did know of the beginning of the interest in land, in Clay County for oil purposes; knew that it began in 1935; that it progressed in 1936 and that oil had been found in paying quantities. He had participated in the execution of some of the contracts and had prepared abstracts for many of the lands covered by leases. All of this knowledge and information came to him prior to the execution of the deed. Hence it is an established fact that when the deed was delivered to him, he knew that oil had been found in paying quantities on farms not remote from this land.

Further, Reaugh had negotiated with the receiver of the bank which held the decree of foreclosure and the judgment against Hush, in 1935, and by approval of the Comptroller of the Currency, on September 19, 1935, for the sum of $100, he procured an assignment of the foreclosure decree to himself and a release of the judgment against Hush. So from that time hence, he stood in the position of a mortgagee holding a decree of foreclosure against the land in which Hush had merely an equity of redemption. Consequently the conveyance from Hush to Reaugh was in its essence the release of an equity of redemption by a mortgagor to the mortgagee and must be tested by the rules governing such transactions.

While this development of oil activity had progressed in Clay County, Hush, as we have seen, was living in Columbus, some 400 miles distant, earning a precarious living. The evidence is undisputed that after he left Clay City in 1934, he received no communications by letter, newspaper or parol concerning the status of lands or their uses for oil in Clay County, the activity there prevailing or the development then going forward except such he says he obtained from Reaugh when the latter approached him for a deed.

Reaugh made two trips to Columbus to see Hush. He claims that his first, made in August, 1935, was merely a side trip on his real journey to Akron. At that time he stopped to see Hush. The parties' recollections of the ensuing conversation do not agree. Hush says that Reaugh asked him if he would take $100 for a quit claim deed and that Hush replied that he did not

care to do anything about it. Reaugh told him, he says, that the land had sold for taxes; that it was worthless and that if he could get anything, he had better take it. Hush testifies that he asked Reaugh, who wished to buy the land and that Reaugh replied that he did not know; that he "thought that he would find out if Hush would sell" and that he had better accept the offer. Hush says that he refused to accept the offer because there had been no action taken upon the foreclosure decree and he saw no necessity for doing anything. Reaugh says that this visit was in August of 1935; that he purchased the foreclosure decree in September, 1935, and procured then a release of the personal judgment against the land. He testifies that at the time of his visit in August, he told Hush the bank was offering to sell the decree; that the personal judgment still existed and that there was a tax deed due Dillman; that it might be necessary to bring suit to cancel the tax deed; that no sale had taken place in the foreclosure and that the purchaser of the decree would pay him something to avoid the expense of a sale. He says that Hush replied that he had no money and that he, Reaugh, told him that if the decree could be purchased at a discount the purchaser would pay him $50. He testifies that Hush answered that he would not take $50 but would accept $100; that he replied he would advise Hush later.

In March, 1937, three days after the report was current in Clay County that the Weiler well, one and a quarter miles from the Hush farm, had been brought in with paying quantities of oil, Reaugh reappeared in Columbus. He testifies that he returned at that time again on his way to Akron but that after he concluded his transaction with Hush, he proceeded no further but returned to his home in Illinois.

Again the parties differ as to what happened. Hush says that he was then living with his two boys with one Snyder; that when Reaugh came in, Hush greeted him by saying "How is everything around Clay City." He testifies that Reaugh replied "It is the same old town, you know how it is in a place like that, no change." Hush says that he asked about one Hopkins and one Duff and that Reaugh made reply and then said that he was down in that part of the city and "thought he would see if Hush would sell his land." Hush says he replied that he had not thought of selling it and that Reaugh then answered that it was "no

good" to him, that it was worthless; that taxes and interest were growing and that he had a party who would take it off Hush's hands and pay $100. Hush says that Reaugh told him there would probably be a deficiency judgment; that this would be his last opportunity to get anything out of the land; that he would be lucky tò get $100 and that the land would be sold under the decree if he did not release his equity of redemption.

Mr. and Mrs. Hush were not then living together and the two men proceeded with a notary public to her home. There the deed was executed by both Mr. and Mrs. Hush. Both of them testify substantially that Reaugh again said the land was not worth anything; that $100 was better than nothing; that if Hush did not sign, the foreclosure would proceed and they would get nothing; that DeLong was buying it and that Mrs. Hush then said, "Well, Mr. Reaugh, if 'this is your honest opinion, if this is the truth, I shall rely upon you." Thereupon the deed was executed and Reaugh paid each Mr. and Mrs. Hush $50.

Reaugh testifies that at the conversation, before they saw Mrs. Hush, he told Hush he had come to accept the latter's prior offer to sell for $100; that Hush asked if the deed would have to be signed by his wife; that they then proceeded to Mrs. Hush's home; that Hush went in the home first, and came out and said "She is willing to sign but I must give her half of the money" and that when he, Reaugh, went in the house the only conversation was as to when she would get the money and that he had replied that he would pay it immediately. He denies that Hush at that time asked him about Clay City or Clay County, but says that a similar question had been put to him in 1935. He admits that he did not tell either of the Hushs that he had purchased the decree of foreclosure for $100. He did not tell them that he had procured a release of the personal judgment against Hush or that any activity of any character with regard to the discovery and development of oil from adjacent lands had occurred.

Hush is corroborated in this testimony by a witness, who is disinterested except by such ties as he might have as a friend of Hush, to the effect that Hush made a direct inquiry of Reaugh as to the status of Clay City and Clay County in March, 1937, prior to the execution of the deed and that Reaugh replied that there had been no change; that it was "the same old place." Reaugh admits that the question was put to him on the first visit, but denies that it was put to him on the second. A careful consideration of the evidence convinces me that the question was put and the answer made on March 1, 1937, but, it seems to me in view of my conclusion as to the law, it is immaterial whether the question was put in 1935 or 1937.

It thus appears undisputed that when Reaugh approached Hush the first time, he was negotiating for the purchase of the foreclosure decree and the personal judgment against Hush; that upon the second occasion he had purchased the decree and obtained release of the personal judgment for $100 and had, prior to that time, caused to be executed and delivered to the Oil Company an oil lease giving it the right to produce all the oil under the land upon a royalty basis.

The legal question involved is as to the obligation or lack of obligation, the duty or lack of duty upon Reaugh's part to Hush and, as I have said, Reaugh's obligations in this respect are measured by those of a mortgagee obtaining a release of an equity of redemption from the mortgagor. Was the failure to disclose, of itself, fraud; were the circumstances such that concealment of itself amounted to fraud; were the facts and circumstances such that, in connection with the representation actually made by Reaugh that the community had not changed, such as to constitute fraud?

▇▇ It is the law of Illinois that equity never allows the mortgagee to avail himself of his position to obtain an advantage over the mortgagor in securing an agreement for the vesting of the entire estate in himself; that contracts between the mortgagor and the mortgagee for the purpose of extinguishing the equity of redemption are regarded with jealousy and that in order to determine whether a contract for the extinguishment of the equity is or is not fair and just to the mortgagor, the relation between the parties will be inquired into. Cassem v. Heustis, 201 Ill. 208, at page 215, 66 N.E. 283, 94 Am.St.Rep. 160; Seymour v. Mackay, 126 Ill. 341, 18 N.E. 552; Scanlan v. Scanlan, 134 Ill. 630, 25 N.E. 652; Conant v. Riseborough, 139 Ill. 383, 390, 28 N.E. 789; Cramer v. Wilson, 202 Ill. 83, 66 N.E. 869. The rule obtains commonly that the burden rests on the mortgagee to show the fair-

ness of the transaction and the adequacy of the price. Villa v. Rodriguez, 12 Wall. 323, 20 L.Ed. 406; Bradbury v. Davenport, 114 Cal. 593, 46 P. 1062, 55 Am.St.Rep. 92; Hall v. Hall, 41 S.C. 163, 19 S.E. 305, 44 Am.St.Rep. 696. The law on the subject, it has been said, is similar to that which governs where a sale by a cestui que trust to his trustee is drawn in question; and where confidential relations and the means of oppression exist, the scrutiny is severer than in cases of different character. Villa v. Rodriguez, 12 Wall. 323, 20 L.Ed. 406; Cassem v. Heustis, 201 Ill. 208, 66 N.E. 283, 94 Am.St.Rep. 160.

■ This is quite generally the law, irrespective of the locality. Thus in Russell v. Southard, 53 U.S. 139, 12 How. 139, 13 L. Ed. 927, in discussing the release of an equity of redemption under the laws of Kentucky, the Supreme Court of the United States pointed out that such a release is to be scrutinized to see whether any undue advantage has been taken of the mortgagor. Courts view transactions of that sort between mortgagor and mortgagee with jealousy; and inasmuch as the mortgagee in possession may exercise an undue influence over the mortgagor, especially if the latter be in needy circumstances, the purchase by the former of the equity of redemption is to be scanned scrupulously, when fraud is charged, and only constructive fraud, or an unconscientious advantage which ought not to be retained, need be shown, to avoid such a purchase. The court held that a mortgagee in possession is deemed by a court of equity a trustee in a constructive trust, raised by implication.

■ True there is no relation of trust and confidence between a debtor and his mortgagee, except for the purpose of protecting the equity of redemption. Gierth v. Fidelity Trust Co., 93 N.J.Eq. 163, 115 A. 397, 18 A.L.R. 976. And it cannot be stated that non-disclosure always voids the contract, but it is a question of fact whether, in view of the facts and the partial disclosure or the failure to disclose, full disclosure should have been made. Thus if A induces B to sell land to A, who knows that such land contains a large amount of valuable mineral and that fact is not disclosed to B, but A represents that the land is to be used only as a pasture and that he is buying it to keep persons from going over his own land to the other tract, such non-disclosure, under these facts together with the statements has been held to justify a rescission of the conveyance. Crompton v. Beedle, 83 Vt. 287, 75 A. 331, 30 L.R.A., N.S., 748, Ann.Cas.1912A, 399. And in Illinois, if one who is attempting to procure an oil lease represents that the bonus provided for in the lease is as large as that given under such other leases in that time and place and fails to disclose that a heavy producing well had been opened on a farm adjoining the piece of land, the concealment taken in connection with the mistake of fact, avoids the lease. Douglass v. Treat, 246 Ill. 593, 92 N.E. 976.

In Turner v. Harvey, 1821, Jacob, 169, 37 Eng.Reprint 814, Lord Eldon observed: "Where parties deal for an estate they may put each other at arm's length; the purchaser may use his own knowledge, and is not bound to give the vendor information of the value of his property. As in the case that has been mentioned, if an estate is offered for sale, and I treat for it, knowing that there is a mine under it, and the other party makes no inquiry, I am not bound to give him any information of it; he acts for himself, and exercises his own sense and knowledge." He added, however, this significant language: "But a very little is sufficient to affect the application of that principle. If a word, if a single word, be dropped which tends to mislead the vendor, that principle will not be allowed to operate."

■ The general rule, as above stated, to the effect that the prospective purchaser is not bound to disclose material facts affecting the value of the land, obviously cannot be applied in any case where the purchaser occupies such a fiduciary relation toward the vendor as to impose upon the former the special duty to advise the latter correctly as to the actual value, where the vendor is ignorant regarding it, and is at the mercy of the purchaser, who under the circumstances has undertaken to, or purports to, look out for the seller's best interests. This distinct ground of exception or qualification to the general rule is at least impliedly recognized in most, if not all, of the cases. "It is, therefore, not only necessary that advantage should be taken in such a contract, and that such an advantage should arise from a superiority of skill or information, but it is also necessary to show some obligation binding the party to make such a disclosure." Fox v. Mackreth, 1788, 2 Cox, Ch.Cas. 320, 30 Eng. Reprint 148, also reported in 1788, 2 Bro. Ch. 400, 29 Eng.Reprint, 224.

■ Very slight circumstances, in addition to any intentional concealment, will make a case of fraud, as, where the buyer threw the seller completely off his guard by falsely stating that distant land had no value except for a sheep pasture, and that he wanted it for that purpose, whereas he had discovered a valuable mine thereon. Morgan v. Dinges, 23 Neb. 271, 36 N.W. 544, 8 Am.St.Rep. 121; Hays v. Meyers, 139 Ky. 440, 107 S.W. 287, 17 L.R.A.,N.S., 284, 139 Am.St.Rep. 493; Crompton v. Beedle, 83 Vt. 287, 75 A. 331, 30 L.R.A.,N.S., 748, Ann. Cas.1912A, 399. A very little is sufficient to affect the application of this principle, and statements ordinarily regarded as an expression of an opinion may be considered as sufficient when calculated to mislead, and prevent an examination of the property on the part of the vendor. Stackpole v. Hancock, 40 Fla. 362, 24 So. 914, 45 L.R.A. 814. In Mountain v. Day, 91 Minn. 249, 97 N. W. 883, where the owner of a distant farm, which he had not seen for ten years, was induced to sell it by the purchaser's repeated assertions that it was in poor condition and worth only a certain price per acre (about half its actual value), the decision was predicated upon the ground that the seller had the right to, and did, rely upon the purchaser's misrepresentations, as based upon actual knowledge; particularly as they were repeated after he had been warned by others that he should not sell for so little.

■ Here Reaugh was mortgagee. This fact was not known to Hush. Hush did not know that the decree of foreclosure had been sold for $100. He did not know that the judgment against him for $1,400 had been released. He did not know that Reaugh, after purchasing the judgment, had assumed to be the owner of the land and leased the same for oil purposes. He knew nothing of the discovery of oil and the progress of the development of oil production in Clay County. Either in 1935 or 1937 he was told that the place had not changed—that it was the same old place. And it is immaterial at which time Reaugh made this reply, for if one has made a statement which was true when made and material change takes place in financial condition, in value or in health, he is guilty of fraud in not disclosing such change when he knows or should know that the other party relies on such original representation. Traill v. Baring, 4 De G.J. & S. 318; United States: Piedmont & Arlington Life Ins.

Co. v. Ewing, 92 U.S. 377, 23 L.Ed. 610; Loewer v. Harris, 2 Cir., 57 F. 368; Indiana: Guilford School Township v. Roberts, 28 Ind.App. 355, 62 N.E. 711; Iowa: Noble v. Renner, 177 Iowa 509, 159 N.W. 214. So if Reaugh should be correct in his statement that the inquiry was put to him in 1935 and at that time he was asked about the community and denied any change in it, when he suggested a sale of the equity of redemption, and the matter was left open for future negotiations and he renewed the same eighteen months later and if, in the meantime, the land had become valuable for oil purposes, certainly this was a material change in circumstances which it was his duty to disclose to the unadvised Hush.

■ As pointed out, mere silence is not always proof of fraud but one little word, sufficient to deceive and misinform the other party, may vitally affect the good faith and validity of the transaction. The mere declaration that the community had not changed covered a myriad of representations of fact. It was in itself a denial that anything had developed in that community to change the character or the status of its inhabitants and their property, economically, financially or industrially. It was a blanket representation that the land, judged by the community as it was when Hush left, remained a piece of cut-over timber land of no value. When Reaugh, a mortgagee seeking a release of the equity of redemption, representing himself to Hush to be agent for some unknown purchaser and not himself, concealed his purchase, concealed the discovery of oil, and its development in production, concealed the release of the judgment against Hush, concealed the fact that an oil well had been brought in one and a quarter miles from Hush's land three days before he appeared in a city 400 miles away and made the blanket assertion that the community was unchanged, he violated all the obligations imposed upon a mortgagee in such a situation. His failure to disclose his own position, his concealment of material facts and his direct representation of unchanged conditions, are the strongest evidence of fraud. It follows that the deed to DeLong, his agent, and that to his son, his nominee, and that to Riggle, his agent and associate, are void and must be cancelled. Hush is entitled to redeem from the mortgagee decree held by Reaugh upon payment of $100 received by Hush and of $100 paid by Re-

augh for the assignment of the decree plus taxes and interest, less such sums as may be shown upon an accounting Reaugh has realized from the farm and the oil lease. This is the relief approved by the Supreme Court in Russell v. Southard, 53 U.S. 139, 12 How. 139, 13 L.Ed. 927.

■ However, the rights of the Pure Oil Company rest upon a different basis. That company took an oil lease from Reaugh when the title to the land was held by DeLong. Later when the true condition of the title was revealed, it took from the holder of the title of record a ratification of the lease, on October 13, 1937, subsequent to the execution of the deed by Hush and subsequent to the recording of the affidavit of Hush on August 31, 1937, claiming fraud. This affidavit was recorded in Clay County and purported to give notice of fraud to the world; but such record is only imputed notice and there is no provision in the Illinois Statutes that it shall constitute binding notice. Actual notice thereof does not appear and in the absence of a statute making such an affidavit binding as constructive notice, I am without power to treat the same as of any effect. Capper v. Poulsen, 321 Ill. 480, 152 N.E. 587. The good faith of the Pure Oil Company is not impeached by anything in this record.

The lease, however, must be assigned by the lessors in the same and all defendants claiming any interest therein as lessors or assignees thereof (holding interests in royalties therein) shall assign the same to Hush so that he may, upon making proper redemption, become the lessor. A mandatory injunction to such effect shall be provided in the decree. In the absence of such assignment, the Pure Oil Company shall cancel the lease and report the action to the court and execute an equivalent one to Hush. Obviously, this relief shall be conditioned upon Hush's full and complete redemption in the manner hereinbefore suggested.

■ It is clear from the evidence that the tax deed is not effective as a conveyance of the title. However, under the statutes, it is a valid lien for the amount due in the way of taxes represented by the certificates of purchase merged in the tax deed and the decree shall provide for cancellation of such tax deed upon payment of the amount due the holder thereof.

Proper decree may be submitted.