## William D. Barnes, Appellee, v. A. C. Barnett et al., Appellants.

1. EXCHANGE OF PROPERTY, § 8*—*when fraud in inducing exchange of land.* In an action for fraud and deceit practiced on plaintiff to induce him to make an exchange of his land, the undisputed evidence *held* to conclusively prove a conspiracy on the part of defendants to defraud the plaintiff.

2. FRAUD, § 20*—*when statements concerning land not expression of opinion.* Statements made concerning the value of land, the price of adjoining land, that the land had no hard pan under it, that could easily be tiled and that there had been a large loan made on it, *held* to be statements of material facts and not expressions of opinion.

3. VENDOR AND PURCHASER, § 39*—*when purchaser entitled to recover for fraud and deceit.* Where artifice and fraud are used to prevent a purchaser from inquiring about or making an examination of the land, the fact that the vendor has examined the land does not destroy his right to recover for fraud and deceit.

4. RELEASE, § 21*—*when contract does not constitute.* Where a plaintiff, who had been fraudulently induced by the defendants to exchange his land for other lands, entered into an agreement with the heirs of defendants' grantee of plaintiff's land whereby the plaintiff agreed to surrender his possession of the land in consideration of $2,000, with a certain reservation of the right to litigate the rights of plaintiff and defendants in the lands, *held* that the agreement did not constitute a release of defendants in a suit against defendants for fraud and deceit in inducing plaintiff to make the exchange.

5. EXCHANGE OF PROPERTY, § 8*—*admissibility of evidence.* In an action for fraud and deceit in inducing plaintiff to exchange his land for Missouri land, evidence offered by defendants to prove the value of plaintiff's land *held* inadmissible for the reason it was immaterial and not relevant to the issues in the case where the only question was whether there was fraud and deceit in the conveyance of the Missouri land.

6. RELEASE, § 29*—*sufficiency of instruction on effect of contract.* In an action for fraud and deceit in inducing plaintiff to make an exchange of lands, an instruction given for plaintiff which told the jury that a certain contract between plaintiff and the heirs of defendant's grantee of plaintiff's land "is not a release of a joint tort feasor" and that it should be considered by them only as evidence on the question whether defendants are guilty of fraud and misrep-

resentation, *held* not subject to the criticism that it is peremptory in its nature and withdraws from the jury a part of the facts in the case, but *held* erroneous in telling the jury that they should consider the contract as evidence on the question of fraud.

7. APPEAL AND ERROR, § 1779*—*when errors in instruction not ground for reversal.* The Appellate Court will not reverse for errors in instruction not raised by appellants.

8. EXCHANGE OF PROPERTY, § 8*—*measure of damages in action for false representations.* In an action for fraud and deceit practiced on plaintiff to induce him to exchange his land for Missouri land, an instruction telling the jury that if plaintiff was entitled to recover he would be entitled to the difference between the value of the Missouri land as it was at the time of the sale and what it would have been worth if the representations of defendant had been true, with interest at five per cent., *held* to state the correct measure of damages.

9. APPEAL AND ERROR, § 1011*—*when improper remarks of counsel not saved for review.* Improper statements of counsel in his argument to the jury, not saved for review where the trial judge has not certified to any statements of counsel and there is no exception to any of his statements.

10. APPEAL AND ERROR, § 1011*—*method of saving improper remarks of counsel for review.* The question of whether or not improper or prejudicial argument was made to the jury cannot be saved by *ex parte* affidavits; the statements must be certified to by the trial judge in the bill of exceptions.

11. NEW TRIAL, § 67*—*when newly-discovered evidence insufficient to constitute ground for.* Newly-discovered evidence is insufficient as ground for a new trial where it is only cumulative and in the nature of impeaching evidence and would have not changed the verdict.

PHILBRICK, J., took no part in the decision of this case.

Appeal from the Circuit Court of Champaign county; the Hon. WILLIAM G. COCHRAN, Judge, presiding. Heard in this court at the October term, 1913. Affirmed. Opinion filed May 5, 1914. Rehearing denied June 25, 1914. *Certiorari* denied by Supreme Court (making opinion final).

L. B. SAFFER and JOHN J. REA, for appellants.

ROBERT P. BURKHALTER and DOBBINS & DOBBINS, for appellee.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

MR. PRESIDING JUSTICE THOMPSON delivered the . opinion of the court.

This is an action on the case, brought by William D. Barnes against A. C. Barnett, George P. Bliss, A. R. Scott and James E. Sunderland to recover damages for fraud and deceit averred to have been practiced on the plaintiff by the defendants in the exchange of real estate.

The case was tried upon the second amended count of the declaration which avers that in May, 1909, the plaintiff was the owner of certain described real estate, consisting of 494 acres in Champaign county, Illinois, and 320 acres in Walsh county, North Dakota; that it was agreed between plaintiff and defendants that all said real estate was of the fair cash value of over $60,000 above all incumbrances and liens thereon and that the defendants conspired together to cheat and defraud plaintiff out of his said real estate and to exchange therefor certain described real estate in the county of St. Charles, Missouri, which they knew to be worth not more than $24,500, by fraudulently inducing the plaintiff to accept said real estate and pay therefor the sum of $70,350, subject to an incumbrance thereon of $24,500, in exchange for his equity in said lands in Illinois and North Dakota. The count pleads certain acts of the defendants in furtherance of the alleged conspiracy, and further avers that defendants induced the plaintiff to visit the Missouri land for the pretended purpose of appraising wheat growing thereon and that they afterwards kept plaintiff under their control and represented to him that the Missouri land was of the value of $70,000 and that an insurance company had loaned $16,000 thereon, when the said land was worth not to exceed $22,000 and the mortgage on it was $6,500; that the land could not be purchased for less than $200 per acre when in fact it could be bought for $60 per acre, and that plaintiff was not familiar with the value of farm lands in Mis-

souri, which was known to defendants; that defendants knew the representations made by them were false and that plaintiff relying on such representations conveyed his land to A. C. Barnett at an agreed price of $123,-000 and was fraudulently induced to purchase said Missouri land and pay therefor the sum of $70,350, and to assume an incumbrance of $16,000 and to execute a mortgage thereon to said Barnett for the sum of $8,500, which said incumbrances were more than the value of said Missouri land, to the damage of appellee of $60,000.

The defendants filed three pleas; (1) The general issue, (2) a plea of former adjudication and (3) a plea of release which avers that plaintiff had accepted $2,000 from the heirs of S. T. Busey, deceased, in full of all damages arising out of said transaction. Issue was joined on the general issue and replications filed denying the special pleas, and on these issues were joined.

On a trial before a jury a verdict in favor of plaintiff for $58,168,54 was returned against all the defendants on which judgment was entered, and Bliss, Scott and Sunderland prosecute this appeal.

It is contended that the judgment cannot be sustained on the evidence and that the judgment is excessive. The record disclosed that appellee, in 1909, was a bachelor farmer of the age of sixty-six years living on a farm consisting of 280 acres near Gifford, Illinois, in Champaign county, on which were various mortgages, the principal of which amounted to $37,-400. About a year prior to that time he had bought another farm of 214 acres near Bondville, in the same county, known as the John F. Busey farm. At the time he purchased the Busey farm he gave a mortgage to Busey for $30,000 covering both his Illinois farms. There was also a mortgage of $5,000 on his Dakota land. He was also indebted on some judgment notes, which he had given in the purchase of some oil stocks. Appellants Scott and Sunderland are partners and real

estate agents having offices in the city of Champaign. It was through their agency that appellee bought the Busey farm. Appellee had, early in 1909, placed the Busey farm and his Dakota land in the hands of Scott and Sunderland for sale fixing the price on the Busey farm at $225 an acre, telling them he wanted to sell it as interest was eating him up. Appellant Bliss is in the real estate brokerage and abstract business in the city of Urbana and advertised that he dealt in southern timber land. Sunderland and appellee had been raised in the same neighborhood and had been acquainted with each other for many years. Scott, Sunderland and Bliss appear to have been well acquainted with appellee's financial affairs.

Defendant Barnett, who does not appeal, is an attorney residing at McLeansboro, Illinois, and his business appears to be dealing in real estate. In February, 1909, Bliss wrote to appellee telling him that he had better get out of debt and trade his farm for a farm in the south. Later he again wrote appellee informing him that judgments had been entered against him on some notes, and that he had better look out for executions against his corn and other personal property. Appellee did not answer these letters. In February, 1909, Bliss began correspondence with an abstracting firm composed of Ben L. Emmons and Ben L. Emmons, Jr., at St. Charles, about twenty miles from St. Louis, Missouri, stating that he wanted some options on some Missouri lands and inclosing some blank forms of options, which he stated in his letter would "draw blood in a suit in chancery for specific performance." The letter further states: "I have exchange contracts which I enclose and agreement for deed that also makes the attorney for defendant scratch his head some."

The record does not disclose how Barnett first became connected with the transaction involved in this case, further than that he testified that he had had

some conversation with Scott and Sunderland about trading some property he was about to acquire with some of their customers, and that the first time he saw appellant about this trade was May 13, 1909. However, on April 20, 1909, he had written to appellee from Urbana on the stationery of Bliss that he was in Urbana, and wanted appellee not to fail to come and see him. Appellee did not answer this letter. Barnett next appears in St. Charles, Mo., at Emmons' office, where he represented himself as an attorney representing Col. Busey and Bliss, and proved that he represented Bliss by showing the correspondence between Emmons and Bliss with reference to the option. At Emmons' office he desired to be shown some farms on which options could be secured. Before this time, but when the evidence does not disclose except that it was before any talk was had with appellee about the trade that was subsequently made, there had been an arrangement made between Bliss, Scott, Sunderland and Barnett that they were each to have twenty-five per cent. of the profits made in any deal with appellee. All the appellants and Barnett testified to such an agreement.

After looking at various farms Barnett was shown the Perly Reynolds farm of 339 acres lying near the Mississippi river. Reynolds had only owned this farm two months. Barnett asked Reynolds the price of the farm and Reynolds told him $65 an acre. Barnett secured an option on this farm to Emmons bearing date May 8, 1909, giving him the right to take the farm at $22,000, which only bound Emmons for the payment of $1 for the option. By the terms of the option Emmons had the right to assume a mortgage for $6,500 on the farm and give a second mortgage for $4,000 as part of the purchase money and the deed was to be made to Emmons or his assigns or to any person he might elect. This option has written on it an assignment dated May 12th from Emmons to Bliss and on the same date an assignment from Bliss to Barnett.

After this option had been secured Barnett informed Emmons that Scott and Sunderland would be down with a buyer the next day, and asked him to arrange for a conveyance, preferably an automobile, to take them to see the farm and told Reynolds "to go duck hunting the next day" as "they were going to show the farm to a prospective buyer, and they thought it best that he be away, as they did not want the buyer to talk with the owner." Barnett then left for St. Louis. Emmons testified that Barnett asked him to telephone to a certain hotel in St. Louis as soon as Scott and Sunderland started to return to St. Louis with the prospective buyer, this however is denied by Barnett.

Appellee was induced by Sunderland to go to St. Charles on May 13th and look at the Reynolds land, but there is a conflict in the evidence as to the purpose for which he went there. Appellee testified that Sunderland came to his farm near Gifford when he was burning brush on the side of the road and said to him, "Hello Billy, I got a buyer for your land." Appellee said, "That's nice, when are going to show it," and Sunderland replied, "Well, I want you to go to Missouri and estimate a piece of wheat for me." And arrangements were made to go to St. Charles. Sunderland testified that appellee had told him he wanted to sell or trade all his land in Illinois and Dakota, and that about May 10th, at appellee's farm near Gifford where he was burning brush, he, Sunderland, said to appellee that he knew a party that had 340 acres in Missouri that he held at $210 an acre who would entertain a trade for appellee's land, and appellee said he was very busy but would go down the next day and look at it. Appellee and Sunderland went to St. Louis on May 12th, stayed at the Majestic hotel all night and the next morning went to St. Charles, where it was raining hard and they went to a hotel. Sunderland then went to get a rig to drive out to look at the farm,

as he says, and at the wheat, as appellee says, and returned with a surrey with Scott and Emmons, Jr., in it. Appellee greeted Scott, "Hello, Scott, you down here, what are you doing here?" and Scott replied he was there on business and appellee replied, "I didn't expect to meet you here." Appellee testified Scott asked him if he would go out and estimate the wheat. Sunderland, Scott, Emmons and appellee drove to the Reynolds farm about six miles from town and on the way appellee's attention was called to a field of alfalfa. After arriving at the Reynolds farm they did not enter either of the houses on it, nor did appellee see Reynolds, or appear to pay any attention to the quality of the land although Scott got out of the surrey at one place and got a handful of soil and showed it to appellee and called his attention to some clover and the drainage. Scott endeavored to show appellee how the farm would drain and appellee suggested that drainage would depend on whether there was hard pan in the soil and Scott replied there was no hard pan in that country. The evidence shows that there is an impervious clay, which is hard pan, under the farm. Appellee stated to those with him that he would be surprised if the wheat turned out twenty bushel to the acre and did not get out of the rig while on the farm except in the barn into which they drove because of the rain. The evidence shows that the land in St. Charles county which lies in the Mississippi slope is what is known as "Black Stick" or "gumbo" and is hard pan land and that it is not worth over $40 to $60 an acre, while the land on the Missouri slope is a sandy loam, fertile and readily sells at from $200 to $300 an acre. On the way back to St. Charles, Scott and Sunderland called appellee's attention to various farms. Scott pointed out a farm called the Nippenberger farm, and said a man had paid $100 an acre for a half interest in it a few days previous, when as a matter of fact he had only paid $50 an acre, and various other

farms were pointed out as worth from $250 to $400 an acre which could have been bought for a third of the price named by Scott.

It is also shown by the evidence that a deed of the Reynolds farm to Barnett was executed and placed in escrow the day before appellee visited the farm and that the day the deed was made Scott went to the telegraph office to send a message to some person.

When Scott and Sunderland with appellee started on a car back to St. Louis, Emmons telephoned to the Majestic Hotel, as he testified he had been requested by Barnett to do, that they had started for St. Louis, and Scott, Sunderland and appellee met Barnett as soon as they arrived back in St. Louis. Scott and Sunderland appear to have kept appellee in their company until they arrived back in Champaign, and in Champaign Scott took appellee with him to his hotel or rooming house and the next morning, May 14, 1909, he with Scott and Sunderland went to the office of Bliss, where Barnett shortly appeared and a written contract, witnessed by all appellants was entered into for the conveyance of all appellee's lands to Barnett, reserving to appellee the possession of the 280 acre farm near Gifford until March 1, 1910, and of the Reynolds farm to appellee. At the same time appellee executed and delivered a deed conveying to Barnett all his land in Illinois for the consideration of $106,-447, subject to all indebtedness of record against it, and a deed of the Dakota land for the consideration of $16,000 subject to the $5,000 mortgage on it. The deed of the Illinois land to Barnett was recorded May 14th.

On the same day Barnett made a deed of the Reynolds land to appellee for the consideration of $70,350, subject to present mortgage indebtedness not to exceed $16,000. This deed was acknowledged before appellant Bliss, who was a notary public, but was held by Bliss about a month, until some other trust deeds in

addition to the $6,500 already on this land could be placed upon it and recorded. A few days before May 14, 1909, Barnett with Bliss went to S. T. Busey, a wealthy resident of Champaign, and told him he was about to buy some land which he expected to trade to appellee and wanted to borrow $9,000. On June 14th, Barnett made a deed of trust on the Reynolds land to Ben Emmons, Jr., securing four notes, each for the principal sum of $2,000 and interest at six per cent. per annum. This trust deed was recorded June 15th at 11 A. M. The deed of the Reynolds land to Barnett was not recorded until after appellee executed a trust deed on that land to S. T. Busey, trustee for Barnett, securing a note for $8,977 to Barnett which was assigned by him before this suit was begun. This trust deed was recorded June 15th at 12 M. Appellee did not receive any money on this trust deed, but it was received by Barnett and used by him with three of the notes to Emmons and with $500 realized on the other note to Emmons, which had been discounted at a bank, to pay the purchase money due Reynolds above the $6,500 mortgage on the land. There is evidence that Bliss told appellee that Col. Busey was the purchaser of his Illinois land and that it was Busey's way of doing business to have the title go through a third party. The record of the evidence is very voluminous and while there is much contradictory evidence we do not deem it necessary to review it at further length.

The prominent undisputed facts conclusively prove a conspiracy on the part of appellants and Barnett and show a very clear case of fraud and deceit on the part of appellants with Barnett to defraud appellee in the conveyance to him of the Reynolds land. Neither Barnett nor appellants had any real interest in the Reynolds land when the contract was made with appellee; all they had was an option to buy it at $22,000. Before delivering the deed to appellee they had it mortgaged in the sum of $23,477, which includes the

$6,500 on it before they procured the option. The
mortgages amounted to more than its value.

Appellee got nothing for his Illinois and Dakota
land. The appellants knew that appellee was ignorant
of the value of the Missouri land and so maneuvered
with appellee that he would not discover the fraud
that was being perpetrated on him.

Appellants deliberately and falsely stated the value
of the land conveyed to appellee; they falsely stated
to him the selling price of adjoining lands; that the
land was a sandy loam; that there was no hard pan
under it; that it could easily be tiled and that there
had been a loan of $16,000 on it. These were material
facts and not expressions of opinion. *Hughes v. Lock-
ington,* 221 Ill. 571; *Douglass v. Treat,* 246 Ill. 593;
*Leonard v. Springer,* 197 Ill. 539. Where artifice and
fraud are used to prevent a purchaser from inquiring
about or making an examination of the land, the fact
that the vendor has examined the land does not destroy
his right to recover for fraud and deceit. *Hughes v.
Lockington, supra.* Appellee was not a resident of the
locality where the land was located and he had a right
to rely on the representations of appellants. *Ladd v.
Pigott,* 114 Ill. 647; *Wenegar v. Bollenbach,* 180 Ill. 222.
Appellee was induced by the fraud of appellants to
take it at $210 per acre. Reynolds only asked $65 an
acre and the evidence shows it was worth less than
the option price. Even at $65 an acre appellee was
defrauded out of $48,575, which with interest to the
time of the trial would make the verdict and the judg-
ment for the correct amount.

There is no evidence whatever in support of the
second plea or that the matters in controversy here
were ever involved in any other suit.

A bill in chancery by appellee against the heirs of
S. T. Busey, Mrs. Busey, appellants and Barnett was
prepared to be filed, but never filed, for a cancellation
of the deeds made by appellee to Barnett and a deed
made by Barnett conveying the same land to Busey.

This bill was never filed but on December 3, 1909, an agreement was made between Mrs. Busey and appellee by which in consideration of $2,000 paid by Mrs. Busey to appellee he should surrender to Mrs. Busey possession of the farm near Gifford, the possession of which to March 1, 1910, had been reserved to appellee in the contract of May 14th, and that all the lands originally owned by appellee should be sold at not less than certain stated prices within one year from the date of the agreement, and after the moneys due the Busey estate should be paid the balance of the moneys received should be held subject to the claims of Bliss, Scott, Sunderland, Barnett and one George M. Thompson, who was the attorney for appellee. This was a contract to hold in escrow the proceeds of the sale of the lands until the right of the parties should be settled by litigation. No fraud is charged against Busey, and the payment of the $2,000 for the possession of the land, with the reservation of the right to litigate the rights of appellee and appellants in the lands or the proceeds thereof, cannot be a release of appellants in a suit for fraud and deceit as is claimed under the third plea.

It is contended that the court erred in refusing to permit appellants to prove the value of the lands conveyed to Barnett by appellee.

There was no issue before the court on that question, the only question was the fraud and deceit in the conveyance of the Reynolds land to appellee. The evidence offered was immaterial and not relevant to the issues in the case for the reason the averment with the proof is that appellants took appellee's land at an agreed price concerning which there is no allegation of fraud. *Drew v. Beall*, 62 Ill. 164; *Stanhope v. Swafford*, 80 Iowa 45; *Matlock v. Reppy*, 47 Ark. 148; *Hecht v. Metzler*, 14 Utah 408, 60 St. Rep. 911.

Appellants contend that the fourth instruction given for appellee was erroneous "as it is peremptory in

its nature and withdraws from the jury part of the facts in the case." This instruction told the jury that the contract between plaintiff and the heirs of S. T. Busey "is not a release of a joint tort feasor" and that it should be considered by the jury only as evidence on the question of whether defendants are guilty of fraud and misrepresentation. The instruction was only peremptory in telling the jury that it was not a release of appellants. It was the right and duty of the court to construe the agreement, and the court did not err in the particulars contended for by appellants for the reason there is not a shadow of evidence tending to show that Busey was a joint tort feasor and the agreement is not a release of any person. The instruction, however, was erroneous in telling the jury that they should consider it as evidence on the question of fraud. It was a transaction *inter alios* and not proper to be considered on the issue of whether appellants were guilty of fraud, but the appellants have not raised any question over that part of the instruction and an Appellate Court should not reverse for reasons not raised by appellants.

It is also stated on behalf of appellants that the instructions on the measure of damages given at the request of appellee are erroneous, but it is not pointed out in what way they are erroneous. The instructions told the jury that if plaintiff was entitled to recover he would be entitled to the difference between the value of the Missouri land, as it was at the time of the sale and what it would have been worth if the representations made by the defendants had been true, with interest at five per cent. This is the correct measure of damages as announced in *Schwitters v. Springer*, 236 Ill. 271.

It is also contended that the case should be reversed because of statements made by counsel for appellee in his closing argument to the jury. The trial judge has not certified to any statements made by counsel,

neither is there any exception to any statements of counsel. There are incorporated in the record contradictory affidavits made by appellants and by counsel for appellee as to what was said in argument. The trial court does not certify which, if either, is correct. The question of whether or not improper or prejudicial argument was made to a jury cannot be saved by *ex parte* affidavits. The statements made must be certified to by the trial judge in the bill of exceptions. *Peyton v. Village of Morgan Park,* 172 Ill. 102; *Mayes v. People,* 106 Ill. 314; *People v. Nall,* 242 Ill. 284.

Appellants contend that a new trial should have been granted because of newly-discovered evidence. The newly-discovered evidence as set forth in the affidavits filed is only cumulative and in the nature of impeaching evidence. It would not have changed the verdict and was not of sufficient importance to have required the granting of a new trial.

Finding no reversible error the judgment is affirmed.

*Affirmed.*

MR. JUSTICE PHILBRICK took no part in the decision of this case.